# UNITED STATES *v.* ARTHUR YOUNG & CO. ET AL.

No. 82–687.   Argued January 16, 1984—Decided March 21, 1984

806

BURGER, C. J., delivered the opinion for a unanimous Court.

*Mark I. Levy* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Archer, Deputy Solicitor General Bator, Stuart A. Smith, Carleton D. Powell,* and *Kristina E. Harrigan.*

*Carl D. Liggio* argued the cause for respondent Arthur Young & Co. With him on the brief were *John E. Matson* and *Richard I. Janvey. William Eldred Jackson* argued the cause for respondent Amerada Hess Corp. With him on the brief were *Russell E. Brooks, John C. Maloney, Jr.,* and *Robert G. Morvillo.*[*]

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether tax accrual workpapers prepared by a corporation's independent certified public accountant in the course of regular financial audits are protected from disclosure in response to an Internal Revenue Service summons issued under § 7602 of the Internal Revenue Code of 1954 (Code), 26 U. S. C. § 7602.

---

[*]*E. Barrett Prettyman, Jr., Arnold C. Johnson, Walter A. Smith, Jr., William A. Wise,* and *Walter P. Zivley* filed a brief for El Paso Co. as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Institute of Certified Public Accountants by *Kenneth J. Bialkin* and *Louis A. Craco;* for Arthur Andersen & Co. et al. by *Eldon Olson, Victor M. Earle III, Donald Dreyfus, Harris J. Amhowitz,* and *Kenneth H. Lang;* for the Committee on Corporate Law Departments of the Association of the Bar of the City of New York by *David Lasky;* and for the Tax Executives Institute, Inc., by *Timothy J. McCormally.*

*Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae.*

## I

## A

Respondent Arthur Young & Co. is a firm of certified public accountants. As the independent auditor for respondent Amerada Hess Corp., Young is responsible for reviewing the financial statements prepared by Amerada as required by the federal securities laws.[1] In the course of its review of these financial statements, Young verified Amerada's statement of its contingent tax liabilities, and, in so doing, prepared the tax accrual workpapers at issue in this case. Tax accrual workpapers are documents and memoranda relating to Young's evaluation of Amerada's reserves for contingent tax liabilities. Such workpapers sometimes contain information pertaining to Amerada's financial transactions, identify questionable positions Amerada may have taken on its tax returns, and reflect Young's opinions regarding the validity of such positions. See *infra*, at 810–813.

In 1975 the Internal Revenue Service began a routine audit to determine Amerada's corporate income tax liability for the tax years 1972 through 1974. When the audit revealed that Amerada had made questionable payments of $7,830 from a "special disbursement account," the IRS instituted a criminal investigation of Amerada's tax returns as well. In that process, pursuant to Code § 7602, 26 U. S. C. § 7602,[2] the IRS

---

[1] See, *e. g.*, Securities Exchange Act of 1934, §§ 12(b)(1)(J)–(L), 48 Stat. 892, as redesignated, 78 Stat. 565, 15 U. S. C. §§ 78*l*(b)(1)(J)–(L); Regulation S–X, 17 CFR § 210 *et seq.* (1983). See also n. 5, *infra.*

[2] Section 7602 of the Code, 26 U. S. C. § 7602, provides as follows:

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession,

issued an administrative summons to Young, which required Young to make available to the IRS all its Amerada files, including its tax accrual workpapers. Amerada instructed Young not to comply with the summons.

The IRS then commenced this enforcement action against Young in the United States District Court for the Southern District of New York. See 26 U. S. C. § 7604.[3] Amerada intervened, as permitted by 26 U. S. C. § 7609(b)(1).[4] The District Court found that Young's tax accrual workpapers were relevant to the IRS investigation within the meaning of § 7602 and refused to recognize an accountant-client privilege that would protect the workpapers. 496 F. Supp. 1152, 1156–1157 (1980). Accordingly, the District Court ordered the summons enforced.

B

A divided United States Court of Appeals for the Second Circuit affirmed in part and reversed in part. 677 F. 2d 211

---

custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary may deem proper, to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

[3] Section 7604 of the Code, 26 U. S. C. § 7604, provides:

"If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data."

[4] The IRS summons served upon Young sought the production of records concerning the business transactions and affairs of Young's client, Amerada. Accordingly, under Code § 7609(a)(1), 26 U. S. C. § 7609(a)(1), Amerada was entitled to notice of the IRS summons. Section 7609(b)(1) provides that "any person who is entitled to notice of a summons under subsection (a) shall have the right to intervene in any proceeding with respect to the enforcement of such summons under section 7604."

(1982). The Court of Appeals majority agreed with the District Court that the tax accrual workpapers were relevant to the IRS investigation of Amerada, but held that the public interest in promoting full disclosure to public accountants, and in turn ensuring the integrity of the securities markets, required protection for the work that such independent auditors perform for publicly owned companies. Drawing upon *Hickman* v. *Taylor*, 329 U. S. 495 (1947), and Federal Rule of Civil Procedure 26(b)(3), the Court of Appeals fashioned a work-product immunity doctrine for tax accrual workpapers prepared by independent auditors in the course of compliance with the federal securities laws. Because the IRS had not demonstrated a sufficient showing of need to overcome the immunity and was not seeking to prove fraud on Amerada's part, the Court of Appeals refused to enforce the summons insofar as it sought Young's tax accrual workpapers.

One judge dissented from that portion of the majority opinion creating a work-product immunity for accountants' tax accrual workpapers. The dissent viewed the statutory summons authority, 26 U. S. C. § 7602, as reflecting a congressional decision in favor of the disclosure of such workpapers. The dissent also rejected the policy justifications asserted by the majority for an accountant work-product immunity, reasoning that such protection was not necessary to ensure the integrity of the independent auditor's certification of a corporation's financial statements.

We granted certiorari, 459 U. S. 1199 (1983). We affirm in part and reverse in part.

## II

Corporate financial statements are one of the primary sources of information available to guide the decisions of the investing public. In an effort to control the accuracy of the financial data available to investors in the securities markets, various provisions of the federal securities laws require

publicly held corporations to file their financial statements with the Securities and Exchange Commission.[5] Commission regulations stipulate that these financial reports must be audited by an independent certified public accountant in accordance with generally accepted auditing standards.[6] By examining the corporation's books and records, the independent auditor determines whether the financial reports of the corporation have been prepared in accordance with generally accepted accounting principles.[7] The auditor then issues an opinion as to whether the financial statements, taken as a whole, fairly present the financial position and operations of the corporation for the relevant period.[8] See n. 13, *infra.*

---

[5] See Securities Act of 1933, Schedule A (25)–(27), 48 Stat. 88, 15 U. S. C. § 77aa (filing of audited financial statement prior to registration of new stock issue); Securities Exchange Act of 1934, §§ 12(b)(1)(J)–(L), 48 Stat. 892, as redesignated, 78 Stat. 565, 15 U. S. C. §§ 78*l*(b)(1)(J)–(L) (filing of audited financial statement prior to listing securities on an exchange); Securities Exchange Act of 1934, §§ 13(a)(2), 13(b), 48 Stat. 894, as amended, 15 U. S. C. §§ 78m(a)(2), 78m(b); 17 CFR §§ 249.310, 249.460 (1983) (filing of annual reports); Securities Exchange Act of 1934, § 14, 48 Stat. 895, as amended, 15 U. S. C. § 78n; Schedule 14A, Item 15, 17 CFR § 240.14a–101 (1983) (filing of audited financial statement in connection with proxy and information statements).

[6] Regulation S–X, 17 CFR § 210 *et seq.* (1983), prescribes the qualifications of accountants and the contents of the accountants' reports that must be submitted with corporate financial statements. In particular, 17 CFR § 210.1–02(d) (1983) requires that the financial statements of a public corporation must be audited by an accountant "in accordance with generally accepted auditing standards." "Generally accepted auditing standards" are promulgated by a committee of the public accounting profession's national organization, the American Institute of Certified Public Accountants (AICPA). See 1 AICPA Professional Standards (CCH) § 150.02 (1972).

[7] See 1 AICPA, Statement on Auditing Standards § 110.01 (1972). Promulgated by the accounting profession's Financial Accounting Standards Board, "generally accepted accounting principles" are the conventions, rules, and procedures that define accepted accounting practices. See W. Meigs, E. Larsen, & R. Meigs, Principles of Auditing 25–26 (5th ed. 1973); H. Stettler, Auditing Principles 12–16 (5th ed. 1982).

[8] See 1 AICPA Professional Standards (CCH) § 509 (1974).

An important aspect of the auditor's function is to evaluate the adequacy and reasonableness of the corporation's reserve account for contingent tax liabilities. This reserve account, known as the tax accrual account, the noncurrent tax account, or the tax pool, represents the amount set aside by the corporation to cover adjustments and additions to the corporation's actual tax liability. Additional corporate tax liability may arise from a wide variety of transactions.[9] The presence of a reserve account for such contingent tax liabilities reflects the corporation's awareness of, and preparedness for, the possibility of an assessment of additional taxes.

The independent auditor draws upon many sources in evaluating the sufficiency of the corporation's tax accrual account. Initially, the corporation's books, records, and tax returns must be analyzed in light of the relevant Code provisions, Treasury Regulations, Revenue Rulings, and case law. The auditor will also obtain and assess the opinions, speculations, and projections of management with regard to unclear, aggressive, or questionable tax positions that may have been taken on prior tax returns. In exploring the tax consequences of certain transactions, the auditor often engages in a "worst-case" analysis in order to ensure that the tax accrual account accurately reflects the full extent of the corporation's exposure to additional tax liability. From this conglomeration of data, the auditor is able to estimate the potential cost of each particular contingency, as well as the probability that the additional liability may arise.

The auditor's tax accrual workpapers record this process of examination and analysis. Such workpapers may document the auditor's interviews with corporate personnel, judgments on questions of potential tax liability, and suggestions for al-

---

[9] For example, the characterization of the proceeds of a sale as capital gain instead of ordinary income, the claiming of an investment tax credit, and the attribution of a transaction to a future tax year are decisions requiring judgment calls in gray areas of the Code, any one of which might result in a recomputation of the corporation's outstanding tax liability.

ternative treatments of certain transactions for tax purposes. Tax accrual workpapers also contain an overall evaluation of the sufficiency of the corporation's reserve for contingent tax liabilities, including an item-by-item analysis of the corporation's potential exposure to additional liability. In short, tax accrual workpapers pinpoint the "soft spots" on a corporation's tax return by highlighting those areas in which the corporate taxpayer has taken a position that may, at some later date, require the payment of additional taxes.

## III

In seeking access to Young's tax accrual workpapers, the IRS exercised the summons power conferred by Code § 7602, 26 U. S. C. § 7602, which authorizes the Secretary of the Treasury to summon and "examine any books, papers, records, or other data which may be relevant or material" to a particular tax inquiry.[10] The District Court and the Court of Appeals determined that the tax accrual workpapers at issue in this case satisfied the relevance requirement of § 7602, because they "might have thrown light upon" the correctness of Amerada's tax return.[11] Because the relevance

---

[10] In *United States* v. *Powell*, 379 U. S. 48 (1964), the Court refused to impose a probable-cause requirement in connection with the enforcement of an IRS summons under § 7602. Instead, the Court held that the IRS need only "that the investigation will be conducted pursuant to a legitimate purpose, *that the inquiry may be relevant to the purpose*, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed . . . ." *Id.*, at 57–58 (emphasis added).

[11] The relevance standard employed by the Second Circuit—whether the documents at issue "might have thrown light upon the correctness of the return"—appears to be widely accepted among the Courts of Appeals. See, *e. g.*, *United States* v. *Wyatt*, 637 F. 2d 293, 300 (CA5 1981); *United States* v. *Turner*, 480 F. 2d 272, 279 (CA7 1973); *United States* v. *Ryan*, 455 F. 2d 728, 733 (CA9 1972); *United States* v. *Egenberg*, 443 F. 2d 512, 515–516 (CA3 1971); *Foster* v. *United States*, 265 F. 2d 183, 187 (CA2), cert. denied, 360 U. S. 912 (1959). In *United States* v. *Harrington*, 388 F. 2d 520, 524 (1968), the Second Circuit amplified this test by stating that

of tax accrual workpapers is a logical predicate to the question whether such workpapers should be protected by some form of work-product immunity, we turn first to an evaluation of the relevance issue.[12]  We agree that such workpapers are relevant within the meaning of § 7602.

As the language of § 7602 clearly indicates, an IRS summons is not to be judged by the relevance standards used in deciding whether to admit evidence in federal court.  Cf. Fed. Rule Evid. 401.  The language "may be" reflects Congress' express intention to allow the IRS to obtain items of even *potential* relevance to an ongoing investigation, without reference to its admissibility.  The purpose of Congress is obvious: the Service can hardly be expected to know whether such data will in fact be relevant until they are procured and scrutinized.  As a tool of discovery, the § 7602 summons is critical to the investigative and enforcement functions of the IRS, see *United States* v. *Powell,* 379 U. S. 48, 57 (1964); the Service therefore should not be required to establish that the documents it seeks are actually relevant in any technical, evidentiary sense.

---

"the 'might' in the articulated standard, 'might throw light upon the correctness of the return,' is . . . an indication of a realistic expectation rather than an idle hope that something may be discovered."  But in *United States* v. *Coopers & Lybrand,* 550 F. 2d 615 (1977), the Court of Appeals for the Tenth Circuit held that tax accrual workpapers not prepared in connection with the filing of a corporate tax return were not relevant within the meaning of § 7602.

[12] The petition for certiorari did not question the relevancy of the tax accrual workpapers, and respondents have not filed a cross-petition raising the issue.  Respondents have, however, argued before this Court that the Court of Appeals erred in holding that Young's tax accrual workpapers were relevant to the IRS investigation of Amerada within the meaning of § 7602.  Respondents were clearly entitled to do so, for our precedents establish that a prevailing party may urge any ground in support of the judgment, whether or not that ground was relied upon or even considered by the court below.  See, *e. g., United States* v. *New York Telephone Co.,* 434 U. S. 159, 166, n. 8 (1977); *Dandridge* v. *Williams,* 397 U. S. 471, 475–476, n. 6 (1970).

That tax accrual workpapers are not actually used in the preparation of tax returns by the taxpayer or its own accountants does not bar a finding of relevance within the meaning of § 7602. The filing of a corporate tax return entails much more than filling in the blanks on an IRS form in accordance with undisputed tax principles; more likely than not, the return is a composite interpretation of corporate transactions made by corporate officers in the light most favorable to the taxpayer. It is the responsibility of the IRS to determine whether the corporate taxpayer in completing its return has stretched a particular tax concept beyond what is allowed. Records that illuminate any aspect of the return—such as the tax accrual workpapers at issue in this case—are therefore highly relevant to legitimate IRS inquiry. The Court of Appeals acknowledged this: "It is difficult to say that the assessment by the independent auditor of the correctness of positions taken by the taxpayer in his return would not throw 'light upon' the correctness of the return." 677 F. 2d, at 219. We accordingly affirm the Court of Appeals' holding that Young's tax accrual workpapers are relevant to the IRS investigation of Amerada's tax liability.

## IV

### A

We now turn to consider whether tax accrual workpapers prepared by an independent auditor in the course of a routine review of corporate financial statements should be protected by some form of work-product immunity from disclosure under § 7602. Based upon its evaluation of the competing policies of the federal tax and securities laws, the Court of Appeals found it necessary to create a so-called privilege for the independent auditor's workpapers.

Our complex and comprehensive system of federal taxation, relying as it does upon self-assessment and reporting, demands that all taxpayers be forthright in the disclosure of relevant information to the taxing authorities. Without such

disclosure, and the concomitant power of the Government to compel disclosure, our national tax burden would not be fairly and equitably distributed. In order to encourage effective tax investigations, Congress has endowed the IRS with expansive information-gathering authority; § 7602 is the centerpiece of that congressional design. As we noted in *United States* v. *Bisceglia,* 420 U. S. 141, 146 (1975):

> "The purpose of [§ 7602] is not to accuse, but to inquire. Although such investigations unquestionably involve some invasion of privacy, they are essential to our self-reporting system, and the alternatives could well involve far less agreeable invasions of house, business, and records."

Similarly, we noted in *United States* v. *Euge,* 444 U. S. 707, 711 (1980):

> "[T]his Court has consistently construed congressional intent to require that if the summons authority claimed is necessary for the effective performance of congressionally imposed responsibilities to enforce the tax Code, that authority should be upheld absent express statutory prohibition or substantial countervailing policies."

While § 7602 is "subject to the traditional privileges and limitations," *id.,* at 714, any other restrictions upon the IRS summons power should be avoided "absent unambiguous directions from Congress." *United States* v. *Bisceglia, supra,* at 150. We are unable to discern the sort of "unambiguous directions from Congress" that would justify a judicially created work-product immunity for tax accrual workpapers summoned under § 7602. Indeed, the very language of § 7602 reflects precisely the opposite: a congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry. In light of this explicit statement by the Legislative Branch, courts should be chary in recognizing exceptions to the broad summons authority of the IRS or in fashioning new privileges that would curtail disclosure under

§ 7602. Cf. *Milwaukee* v. *Illinois,* 451 U. S. 304, 315 (1981). If the broad latitude granted to the IRS by § 7602 is to be circumscribed, that is a choice for Congress, and not this Court, to make. See *United States* v. *Euge,* 444 U. S., at 712.

## B

The Court of Appeals nevertheless concluded that "substantial countervailing policies," *id.,* at 711, required the fashioning of a work-product immunity for an independent auditor's tax accrual workpapers. To the extent that the Court of Appeals, in its concern for the "chilling effect" of the disclosure of tax accrual workpapers, sought to facilitate communication between independent auditors and their clients, its remedy more closely resembles a testimonial accountant-client privilege than a work-product immunity for accountants' workpapers. But as this Court stated in *Couch* v. *United States,* 409 U. S. 322, 335 (1973), "no confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases." In light of *Couch,* the Court of Appeals' effort to foster candid communication between accountant and client by creating a self-styled work-product privilege was misplaced, and conflicts with what we see as the clear intent of Congress.

Nor do we find persuasive the argument that a work-product immunity for accountants' tax accrual workpapers is a fitting analogue to the attorney work-product doctrine established in *Hickman* v. *Taylor,* 329 U. S. 495 (1947). The *Hickman* work-product doctrine was founded upon the private attorney's role as the client's confidential adviser and advocate, a loyal representative whose duty it is to present the client's case in the most favorable possible light. An independent certified public accountant performs a different role. By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public ac-

countant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations.

We cannot accept the view that the integrity of the securities markets will suffer absent some protection for accountants' tax accrual workpapers. The Court of Appeals apparently feared that, were the IRS to have access to tax accrual workpapers, a corporation might be tempted to withhold from its auditor certain information relevant and material to a proper evaluation of its financial statements. But the independent certified public accountant cannot be content with the corporation's representations that its tax accrual reserves are adequate; the auditor is ethically and professionally obligated to ascertain for himself as far as possible whether the corporation's contingent tax liabilities have been accurately stated. If the auditor were convinced that the scope of the examination had been limited by management's reluctance to disclose matters relating to the tax accrual reserves, the auditor would be unable to issue an unqualified opinion as to the accuracy of the corporation's financial statements. Instead, the auditor would be required to issue a qualified opinion, an adverse opinion, or a disclaimer of opinion, thereby notifying the investing public of possible potential problems inherent in the corporation's financial reports.[13]

---

[13] An *unqualified opinion,* the most favorable report an auditor may give, represents the auditor's finding that the company's financial statements fairly present the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted account-

Responsible corporate management would not risk a qualified evaluation of a corporate taxpayer's financial posture to afford cover for questionable positions reflected in a prior tax return.[14] Thus, the independent auditor's obligation to serve the public interest assures that the integrity of the securities markets will be preserved, without the need for a work-product immunity for accountants' tax accrual workpapers.[15]

---

ing principles. See 1 AICPA, Statement on Auditing Standards §§ 510, 511.01 (1973). Alternatively, the auditor may give a *qualified opinion*, which states that the financial statements are fairly presented except for, or subject to, a departure from generally accepted accounting principles, a change in accounting principles, or a material uncertainty. *Id.*, § 512. An *adverse opinion* is a reflection of the auditor's determination that the corporation's financial statements do not fairly present the financial position, results of operations, or changes in financial position of the company in conformity with generally accepted accounting principles; an adverse opinion is issued when the auditor determines that the corporation has materially misstated certain items on its financial statements. *Id.*, § 513. Finally, a *disclaimer of opinion* expresses the auditor's inability to draw a conclusion as to the accuracy of the corporate financial records. A disclaimer of opinion is generally issued when the auditor lacks sufficient information about the financial records to issue an overall opinion. *Id.*, § 514. See generally A. Arens & J. Loebbecke, Auditing: An Integrated Approach 643–660 (1976).

[14] The inclusion in an audited financial statement of anything less than an unqualified opinion could send signals to stockholders, creditors, potential investors, and others that the independent auditor has been unable to give the corporation an unqualified bill of financial health. Such a public auditor's opinion could well have serious consequences for the corporation and its shareholders.

[15] Indeed, rather than protecting the investing public by ensuring the accuracy of corporate financial records, insulation of tax accrual workpapers from disclosure might well undermine the public's confidence in the independent auditing process. The SEC requires the filing of audited financial statements in order to obviate the fear of loss from reliance on inaccurate information, thereby encouraging public investment in the Nation's industries. It is therefore not enough that financial statements *be* accurate; the public must also *perceive* them as being accurate. Public faith in the reliability of a corporation's financial statements depends upon the public perception of the outside auditor as an independent professional. Endowing

We also reject respondents' position that fundamental fairness precludes IRS access to accountants' tax accrual workpapers. Respondents urge that the enforcement of an IRS summons for accountants' tax accrual workpapers permits the Government to probe the thought processes of its taxpayer citizens, thereby giving the IRS an unfair advantage in negotiating and litigating tax controversies. But if the SEC itself, or a private plaintiff in securities litigation, sought to obtain the tax accrual workpapers at issue in this case, they would surely be entitled to do so.[16] In light of the broad congressional command of § 7602, no sound reason exists for conferring lesser authority upon the IRS than upon a private litigant suing with regard to transactions concerning which the public has no interest.

Congress has granted to the IRS "broad latitude to adopt enforcement techniques helpful in the performance of [its] tax collection and assessment responsibilities." *United States* v. *Euge,* 444 U. S., at 716, n. 9. Recognizing the intrusiveness of demands for the production of tax accrual workpapers, the IRS has demonstrated administrative sensitivity to the concerns expressed by the accounting profession by tightening its internal requirements for the issuance of such summonses.

---

the workpapers of an independent auditor with a work-product immunity would destroy the appearance of auditor's independence by creating the impression that the auditor is an advocate for the client. If investors were to view the auditor as an advocate for the corporate client, the value of the audit function itself might well be lost. See generally Arens & Loebbecke, *supra,* at 55–58.

[16] See, *e. g.,* Securities Act of 1933, § 19, 48 Stat. 85, 15 U. S. C. § 77s(b) (for purposes of all "necessary and proper" investigations, SEC is empowered to "require the production of any books, papers, or other documents which the Commission deems relevant or material to the inquiry"); Securities Exchange Act of 1934, § 21, 48 Stat. 899, 15 U. S. C. § 78u(b) (same); Fed. Rule Civ. Proc. 26(b)(1) (parties may obtain discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action").

See Internal Revenue Manual § 4024.4 (CCH 1981).[17]   Although these IRS guidelines were not applicable during the years at issue in this case, their promulgation further refutes respondents' fairness argument and reflects an administrative flexibility that reinforces our decision not to reduce irrevocably the § 7602 summons power.

## V

Beyond question it is desirable and in the public interest to encourage full disclosures by corporate clients to their independent accountants; if it is necessary to balance competing interests, however, the need of the Government for full disclosure of all information relevant to tax liability must also weigh in that balance.   This kind of policy choice is best left to the Legislative Branch.   Accordingly, the judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

---

[17] The new IRS guidelines provide that access may be had to accountants' tax accrual workpapers only in "unusual circumstances" and only as a "collateral source for factual data."   The guidelines require the prior written approval of the Chief of the Examination Division of the IRS before an examining agent may request tax accrual workpapers; in addition, they state that the examiner should first take all reasonable means to secure the information from the corporation itself before issuing a summons to the independent auditor.