In re The GHR COMPANIES, INC., f/k/a Good Hope Industries, Inc., GHR Energy Corp., f/k/a Good Hope Refineries, Inc., Southern States, Inc., Southern States Exploration, Inc., Laredo Exploration, Inc., GHR Pipeline Corp., f/k/a Southern Pipe Line Corporation, and Southern Petroleum Trading Co., Ltd., Debtors.

Bankruptcy Nos. 4–83–00060–G, 4–83–00056–G, 4–83–00093–G to 4–83–00095–G, 4–83–00092–G and 4–83–00136–G.

United States Bankruptcy Court,
D. Massachusetts.

July 27, 1984.

Stephen F. Gordon, McCabe/Gordon, Boston, Mass., for debtor—GHR Energy Corp.

Gerrard Kelley, Boston, Mass., for Office of the U.S. Trustee.

Sumner Darman, Silverman & Kudisch, Boston, Mass., for Creditors' Committee, The GHR Companies.

Joseph Braunstein, Reimer & Braunstein, Boston, Mass., for Creditors' Committee, GHR Energy.

Lon S. Babby, Williams & Connolly, Washington, D.C., for Arthur Andersen.

Robert M. Gargill, Choate, Hall & Stewart, Boston, Mass., for Continental Illinois Nat. Bank & Trust Co. of Chicago, agent for debtors' secured bank creditors.

Van Oliver, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Creditors' Committee, GHR Pipeline Corp., Southern States, Inc., So. States Exploration, Inc.

Anthony Constantini, Peat, Marwick Mitchell & Co., New York City, for Office of Gen. Counsel, Peat, Marwick Mitchell & Co.

Richard Weiner, Cadwalader, Wickersham & Taft, New York City, debtors' Special Counsel.

Richard Timbie, Caplin & Drysdale, Chartered, Washington, D.C., debtors' Tax Counsel.

James Irvin, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for Coopers & Lybrand.

Richard Tufaro, Milbank, Tweed, Hadley & McCloy, New York City, for Banks.

## MEMORANDUM AND ORDER

PAUL W. GLENNON, Bankruptcy Judge.

Continental Illinois National Bank and Trust Company of Chicago, agent for the debtors' secured bank creditors ("Banks"),[1] has been attempting to obtain from the debtors ("GHR") and GHR's accountants, Arthur Andersen & Co. ("Andersen"), Coopers & Lybrand ("Coopers") and Peat, Marwick, Mitchell & Co. ("Peat, Marwick") (collectively "accountants")[2] copies of certain documents for the years 1974 through 1983 in connection with the financial affairs of GHR and tax claims filed in these proceedings by the Internal Revenue Service ("IRS") amounting to over $260,000,000.

The Banks assert that because of the magnitude of the IRS claims, ascertaining GHR's tax liability is a necessary factor in developing a disclosure statement and plan of reorganization under § 1125 of the Bankruptcy Code and Bankruptcy Rule 3016.[3] The Banks further posit that this information is necessary to determine whether or not a trustee should be appointed.[4]

1. The Banks' claims allegedly total $800,000,000 and are allegedly secured by liens on all of the debtors' assets, including refinery, pipeline and oil and gas properties.

2. Andersen was GHR's outside auditor for fiscal years 1974 through 1978 and prepared and signed GHR's 1974, 1975, 1977 and 1978 federal income tax returns. GHR's 1976 return was prepared by its own tax department. Peat, Marwick was GHR's outside auditor for fiscal years 1979 and 1980 and prepared and signed GHR's 1979 and 1980 federal income tax returns. Coopers has been GHR's outside auditor since 1981, consulted in the preparation of GHR's federal income tax returns for 1981 and 1982, and is

## FACTS

On June 22, 1983, the Court entered an order directing various persons to appear for examination under Bankruptcy Rule 2004 and to produce designated documents. A stipulated order scheduling production was entered on September 12, 1983, and thereafter tax returns for 1973, 1974 and 1977 through 1982 were produced. Incomplete tax returns for 1976 were produced by GHR. Since that time pleadings have been filed by GHR and its accountants objecting to the notices of examination and subpoenaes duces tecum by which the Banks have sought the production of additional documents. Responsive pleadings have been filed by the Banks.

The Banks are seeking copies of the following documents from GHR and/or its accountants:

### COOPERS DOCUMENTS

At a hearing on February 6, 1984, there was submitted to this Court as Coopers' Exhibit No. 1 a rather lengthy list of 1981 and 1982 "Documents to Be Withheld from Copying." In a supplemental memorandum filed by the Banks on March 2, 1984, this list was shortened by agreement between the parties. The 1981 and 1982 documents still in contention are described below in paragraph numbered 1 through 3. The Banks have also requested a copy of Coopers' 1983 GHR draft financial statement, including footnotes, draft report and audit workpapers.

In addition to other defenses set forth below, Coopers asserts that: The docu-

now consulting in the preparation of the 1983 return.

3. A plan of reorganization was filed by the Banks on May 30, 1984. No disclosure statement has been filed as yet.

4. A motion to appoint a Chapter 11 trustee was filed on January 3, 1984. Due to various other discovery matters which were brought before this Court, the Court is aware that pretrial discovery is ongoing relative to the motion. The Court's order of June 22, 1984 changing venue of the GHR cases to the Bankruptcy Court for the Southern District of Texas necessarily effected a postponement of the trial date.

ments in dispute contain proprietary information; the Banks already have access to most of the material; and the information sought is contained in material already in the Banks' possession. The Banks claim that the information directly relates to GHR's financial affairs and tax liability and is not readily available to them, and that copies are necessary for analysis and possible use as evidence.[5]

The disputed 1981 and 1982 materials were examined by C. Kenneth White ("White"), a certified public accountant and partner in the accounting firm of Ernst & Whinney, employed by the Banks. They were also examined by Dennis R. Jennings ("Jennings"), a certified public accountant and partner in Coopers. Both White, in an affidavit filed March 2, 1984, and Jennings, in a supplemental affidavit filed February 22, 1984, describe the documents in contention. Summaries of the characterizations given the disputed materials by White, Jennings and others are as follows:

1. Administrative Materials:

(a) *MAPs (Matters for Attention of Partners).* Jennings states that this material identifies "significant issues" that Coopers' staff auditors feel must be brought to a partner's attention, and about which a partner may state his conclusions. He admits the MAPs may contain comments bearing on GHR's financial affairs but says they "do no more than summarize or highlight information already provided [and] reflect only upon the internal thought processes or 'life of Coopers & Lybrand.'" White, on the other hand, maintains that certain information relating to GHR's financial affairs contained in the MAPs does not appear elsewhere in the workpapers. His examination "disclosed significant documentation surrounding Debtors' ability to continue in business as a going concern and asset realization issues" as well as marginal comments "which address such items as inter-company account write-offs."

In preparing for the depositions of Coopers' representatives, Attorney Richard D. Cleary ("Cleary") of Milbank, Tweed, Hadley & McCloy, co-counsel for the Banks, examined the documents which Coopers refused to permit the Banks to copy. In an affidavit filed May 2, 1984, Cleary says his examination of the MAPs reveals that the topics of a number of them "directly address the relationship between Debtors and the Banks," including

(1) amendments to credit agreements between the Banks and Debtors and the treatment such amendments are to be given in footnotes to financial statements; (2) defaults by Debtors under credit agreements with the Banks; and, (3) analyses of operating results of Debtors and their affiliates and discussion of whether they are a going concern entity.

Cleary adds that he "observed no discussion in the MAPs of audit practices or procedures peculiar to Coopers."

(b) *Audit Strategy Documentation.* Jennings states that these documents are composed of various writings which deal with planning of the GHR audit and preliminary observations. He says that after a review of these observations, conclusions were made which are reflected in workpapers and other documents already copied by the Banks, and concludes, therefore, that the preliminary observations have no probative value. White contends that these materials "highlight" preliminary conclusions regarding deficiencies and problems with GHR's accounting controls. He notes that these documents contain marginal comments which relate to the "inability of the Debtors' accounting system to capture drilling costs on a per well basis."

(c) *1982 Representation Letter.* This letter was drafted by Coopers and issued by GHR and, states Jennings, acknowledges "its responsibility for the financial statements and [makes] representations as to other matters." Coopers objects to the

---

5. For example, during the April 10, 1984 deposition of Charles H. Rees, a Coopers manager assigned to the GHR audit, a number of documents were marked as exhibits but were not permitted to be appended to the transcript of the deposition.

copying of this letter because GHR has not signed it. White adds that the letter "contains assertions about the completeness of records underlying transactions and accounts, authenticity of records, ownership right to assets, valuations and financial disclosures, among others."

(d) *Report Makeups.* According to Jennings, these documents contain "various kinds of information from the detailed workpapers for the initial report draft." White states that these documents "reveal the scope and magnitude" of audit adjustments which Coopers concluded were necessary.

2. Procedural Testing and Systems Documentation and Evaluation:

(a) *Various Cycle Testing* and (b) *CAAG (Computer Audit Assistance Group).* Jennings says these materials test GHR's "internal accounting controls [and] indicate how some documents and information flow through the accounting system." Jennings states that Coopers "did not rely on the debtors' system of internal controls, but instead relied principally upon validation techniques in conducting its audits," and says these materials deal principally with Coopers' methodology. He admits, however, that the testing materials contain comments made to GHR regarding its internal controls but contends that such comments "were incidental to the audit." According to White, these materials are reflected in the workpapers and test "selected Debtor transactions to verify compliance and proper recording within the Debtors' accounting system."

In a supplemental memorandum filed March 2, 1984, the Banks state that since Coopers admittedly did not rely on GHR's internal controls, this "demonstrate[s] that Debtors' system of internal control was not reliable." Even if incidental to the audit, the Banks aver that the comments to GHR "are central to the question whether current management should be allowed to continue to run the Debtors' operations."

3. Permanent Files:

(a) *Permanent Systems Procedures Testing Materials* and (b) *Internal Control Questionnaire.* Jennings describes this material as being essentially of the same nature as the testing materials described above. White refers to flowcharts and narrative descriptions of GHR's accounting systems and points out that internal control questionnaires are referenced to the flowcharts which are then supplemented with tests of selected transactions. The selected transactions are said to "consist of copies of Debtor documents with cross-references to the flowchart steps." Papers contained within these files entitled "Record of Control Weakness" purportedly "reflect deficiencies in the Debtors' accounting systems." In an article entitled "Evaluating Internal Control," co-authored by Kenneth P. Johnson of Coopers in 1980, Coopers' Internal Control Questionnaire and forms were reproduced and, therefore, are apparently a matter of public knowledge. *See* Exhibit C to Cleary Affidavit filed May 2, 1984.

4. 1983 Workpapers:

Coopers' position is that since the 1983 audit is not complete, any draft report may be misleading, and if discovery is permitted before the audit is completed, Coopers will be less likely to elicit candid information about GHR's financial affairs. Based on the workpapers that he has seen, it is White's opinion that the 1983 workpapers would assist in evaluating the post-petition and pre-petition financial affairs and conduct of GHR; reviewing mismanagement issues identified in the trustee motion; determining the adequacy of GHR's books and records to properly capture financial data and transactions; assessing whether the accounting systems and controls are sufficient to detect errors and irregularities; and evaluating going concern considerations and the valuation or impairment of assets. White states that he has not seen the draft 1983 financial statements which have been prepared but correctly points out that at least some parts were shown to the Court on January 20, 1984. Based upon his experience, the fact that these drafts have been prepared leads White to conclude that

"Coopers field work has been completed and its working papers, if not technically completed have been completed to a high degree of finality." It is also his opinion that the 1983 workpapers contain information substantially similar to that already provided the Banks or which the Banks seek with regard to the 1981 and 1982 workpapers.

### ANDERSEN DOCUMENTS

The same classification of documents the Banks seek from Coopers are sought to be produced for copying from Andersen. In addition, documents have been subpoenaed from Andersen relating to its retention policy for the years 1974 to date.

Andersen raises the same defenses raised by Coopers. Andersen also objects to the production of documents relating to its retention policy on the basis that this request is premature since it "is not now aware that any materials that it may properly be required to produce in this matter are no longer in existence." The cost attendant any production of documents or testimony is also a basis for its objection, and Andersen requests reimbursement of expenses incurred in any such production from the Banks.[6]

### PEAT, MARWICK DOCUMENTS

On February 10, 1984, upon motion of the Banks, this Court entered an order directing the production of documents by Peat, Marwick. GHR filed an amended motion on February 22, 1984 requesting the Court to vacate the order of February 10 citing the defenses raised with regard to the production of documents by Andersen and Coopers. On February 23, 1984, the Court stayed the February 10 order pending resolution of this dispute.

In the affidavit of Attorney Richard C. Tufaro ("Tufaro") filed in support of the Banks' application for the February 10 order, Tufaro admits that Peat, Marwick has substantially complied with the subpoena

duces tecum. However, still to be produced are workpapers relating to federal, state and local tax returns, including audit memoranda and material relating to deficiency claims. According to Tufaro, Peat, Marwick is awaiting the outcome of this controversy before producing the rest of the documents; the Banks have been authorized by Peat, Marwick to advise the Court that it has no objection to the entry of an order requiring production. Peat, Marwick previously objected because under 26 U.S.C. § 7216, it is a misdemeanor for a tax return preparer to release tax return information except pursuant to a court order.

### GHR DOCUMENTS

Tax returns for the year 1976 were prepared by GHR's tax department but GHR produced only the consolidated returns submitted by the parent company, Good Hope Industries, Inc., and not the corporate income tax returns and schedules of its subsidiaries.[7] In addition to the consolidated returns, GHR produced Revenue Agent Reports, for 1976 through 1981 but no other supporting documentation.

GHR and its accountants claim that information needed to analyze and assess the IRS tax claims is readily available from sources less sensitive than the tax workpapers and, in particular, is available from the Revenue Agent Reports as well as the books and records of GHR. Excerpts from the Revenue Agent Report for 1977–1981 are attached as Exhibit A to the February 29, 1984 affidavit of White and summarize adjustments proposed by the IRS. Because of the lack of detail and summary nature of the Revenue Agent Reports, White opines that

> it is impossible to determine how the books and records of Debtors relate to the various issues raised and transactions challenged by the IRS. Indeed, because so many of the adjustments are

---

6. The Banks are willing to pay for copies of the documents produced by Andersen and the other accountants. *See* proposed protective order filed February 29, 1984, at 2; *see also* Tufaro affidavit filed February 29, 1984, at 6.

7. In December of 1980, Good Hope Industries changed its name to The GHR Companies, Inc. Various subsidiaries also changed their corporate names.

based upon failure by Debtors to provide substantiation for deductions claimed, it is impossible to know why documents relating to the transaction were not produced to the IRS or whether they even exist. [Therefore], [t]he tax workpapers of Debtors' accountants, or other tax preparers or advisers, are the only source of information available which would disclose the basis for the computation of Debtors' taxes and the tax accounting methods applied.... Without the tax workpapers, it is impossible to fairly analyze Debtors' tax returns or the challenges raised by the IRS.

Various defenses have been raised by GHR and its accountants in support of their arguments, including the scope of discovery, accountant-client and attorney-client privilege and work-product immunity, confidentiality, relevancy and possible prejudicial effect on GHR's tax liability. These defenses will be taken up separately below.

### 1. *Scope of Discovery*

Motions were filed by GHR to quash the subpoenas issued to Coopers and Andersen, to vacate the order of the Court ordering production of documents by Peat, Marwick, and for protective orders, on the basis that compelling production of certain documents is unreasonable because the documents are privileged and confidential.[8] Opposing motions were filed by the Banks who contend that the documents are properly discoverable pursuant to a Rule 2004 examination,[9] as well as under the rules cited by GHR [10] because they are not privileged and their confidentiality is protected by this Court's stipulated protective order entered September 12, 1983. The Banks further contend that copies are required so that they may

be analyzed and offered as evidence in future hearings, if necessary. In a reply memorandum filed March 7, 1984, GHR and its accountants concede that "the tax return information sought by the Banks is within the general scope of Bankruptcy Rule 2004."

■ This Court has acknowledged that "the scope of a Rule 2004 examination is unfettered and broad." *In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr.D.Mass. 1983). The examination has also been likened to a necessary "fishing expedition." *In re Foerst*, 93 F. 190, 191 (S.D.N.Y.1899). The clear intent of Rule 2004 (and its predecessor rules) is to give parties in interest an opportunity to examine individuals having knowledge of the financial affairs of the debtor in order to preserve the rights of creditors. *In re GHR Energy Corp.*, 35 B.R. 534, 536–37 (citing *Cameron v. United States*, 231 U.S. 710, 34 S.Ct. 244, 58 L.Ed. 448 (1914)). Rule 2004 is peculiar to bankruptcy law and procedure because it affords few of the procedural safeguards that an examination under Rule 26 of the Federal Rules of Civil Procedure does. For example, a Rule 2004 examination "may be heard *ex parte* or it may be heard on notice." *In re GHR Energy Corp., supra*, 33 B.R. at 454. While the documents are otherwise properly discoverable under Rule 2004, GHR and its accountants contend that they are confidential, privileged or are protected by the workproduct immunity doctrine and, therefore, need not be produced for copying.

### 2. *Privilege, Workproduct Immunity and Confidentiality*

---

**8.** The motions were filed pursuant to Bankruptcy Rules 7026, 9014, 9016 and 9018 and Fed.R. Civ.P. 26(b), (c) and 45(b)(1).

**9.** Rule 2004(b) provides as follows:

(b) *Scope of Examination.* The examination of any person under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the

debtor's right to a discharge. In ... a reorganization case under chapter 11 of the Code, ... the examination may also relate to the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any other matter relevant to the case or to the formulation of a plan.

**10.** *Supra* note 8.

■ In declining to apply Georgia's accountant-client privilege as a matter of comity, the court in *In re International Horizons, Inc.,* 689 F.2d 996, 1005 (11th Cir.1982), emphasized "the important federal interest in providing bankruptcy courts and creditors with complete and accurate information regarding debtors' financial condition," as well as "the important federal interest in assuring complete and accurate disclosure in federal bankruptcy proceedings." Furthermore, it is clear from the Supreme Court's recent decision in *United States v. Arthur Young & Co.,* —— U.S. ——, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), as well as from its earlier decision in *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), that no accountant-client privilege exists under federal law.

A ground proferred by GHR and its accountants for not releasing tax return and tax accrual files is that they "contain confidential information gathered for counsel in anticipation of litigation of the IRS claims." Thomas F. Owens, a certified public accountant and partner in Coopers, has been working with Coopers' special tax counsel in connection with the resolution of the IRS claims, and his files were also subpoenaed by the Banks. By way of affidavit, he says his files contain only information gathered or prepared for counsel in anticipation of litigation and, therefore, constitute qualified privileged attorney work-product.

Rule 26(b) of the Federal Rules of Civil Procedure protects disclosure to the extent the "mental impressions, conclusions, opinions, or legal theories" of attorneys would be revealed. However, that same rule provides for discovery of documents prepared in anticipation of litigation if there is a showing of "substantial need," and if a party "is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

The Court in *Arthur Young & Co., supra,* did not find work-product immunity for accountants "a fitting analogue to the attorney work-product doctrine." —— U.S. at ——, 104 S.Ct. at 1503. The Court stated that the "work-product doctrine was founded upon the private attorney's role as the client's confidential advisor and advocate, a loyal representative whose duty it is to present the client's case in the most favorable possible light. An independent certified public accountant performs a different role." *Id.* Significantly, the Court also said that among those to whom the independent certified public accountant owes "ultimate allegiance" are the corporation's creditors. *Id.*

■ It should be borne in mind that the documents are being sought from GHR and its accountants, and not from GHR's attorneys. While the attorney-client privilege exists to protect the client from revelations made in confidence to his attorney, documents prepared by a client in the ordinary course of business or by accountants in preparing corporate tax returns are not so protected merely because they were delivered to counsel for use in litigation. *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

■ GHR and its accountants point to the disclosure limitations in 26 U.S.C. § 6103 to support their position that certain "confidential" information and documents should not be released or produced for copying. 26 U.S.C. § 6103 states as a general rule that "returns and return information shall be confidential." GHR concludes that since § 6103(e)(4) does not specifically include creditors among those exceptions to whom the IRS may disclose tax information in bankruptcy proceedings, its accountants likewise may not do so.

The disclosure limitations in § 6103 are intended to limit the dissemination of information by the IRS. Here, however, the Banks are requesting the tax information from GHR and its accountants, who are permitted to disclose such information upon court order pursuant to 26 U.S.C. § 7216(b)(1)(B). The court in *In re International Horizons, Inc.,* 16 B.R. 484, 485–87 (Bankr.N.D.Ga.1981), *aff'd,* 689 F.2d 996 (11th Cir.1982), reasoned:

[S]ection 6103 is intended to protect tax information from disclosure *only by the government* ... [and] establishes a general policy in favor of the confidentiality of tax returns and the information underlying them. In this case, however, the Committee is seeking information [from the accountant] in order to enable it to accurately assess a Plan of Arrangement proposed by the debtors. The financial information which provides the basis for a tax return is precisely the information needed by the Committee. The court concludes that the Committee's needs are sufficient to overcome any general presumption of confidentiality.

(emphasis added) (footnote and citation omitted). The court also concluded that historical financial information and workpapers were relevant to the evaluation of the financial condition and past operations of the debtors. *Id.* at 488.

In *Arthur Young & Co., supra,* the accountant was responsible for reviewing financial statements prepared by its corporate client and for verifying its client's statement of contingent tax liabilities. In order to accomplish this, tax accrual workpapers were prepared. Such workpapers related to the evaluation of the corporation's reserves for contingent tax liabilities. The Supreme Court described at length the process of examination and analysis involved in gathering information that comprises the audit workpapers:

Initially, the corporation's books, records, and tax returns must be analyzed in light of the relevant Code provisions, Treasury Regulations, Revenue Rulings, and case law. The auditor will also obtain and assess the opinions, speculations, and projections of management with regard to unclear, aggressive, or questionable tax positions that may have been taken on prior tax returns. In exploring the tax consequences of certain transactions, the auditor often engaged in a 'worst case' analysis in order to ensure that the tax accrual account accurately reflects the full extent of the corporation's exposure to additional tax liability. From this conglomeration of data, the auditor is able to estimate the potential cost of each particular contingency, as well as the probability that the additional liability may arise.

The auditor's tax accrual workpapers record this process of examination and analysis. Such workpapers may document the auditor's interviews with corporate personnel, judgments on questions of potential tax liability, and suggestions for alternative treatments of certain transactions for tax purposes. Tax accrual workpapers also contain an overall evaluation of the sufficiency of the corporation's reserve for contingent tax liabilities, including an item-by-item analysis of the corporation's potential exposure to additional liability. In short, tax accrual workpapers pinpoint the 'soft spots' on a corporation's tax return by highlighting those areas in which the corporate taxpayer has taken a position that may, at some later date, require the payment of additional taxes.

*Id.* —— U.S. at ——, 104 S.Ct. at 1500.

Coopers describes the documents which it objects to reproducing for the Banks as "tax accrual workpapers and other material respecting the debtors potential tax liabilities." Andersen objects to the subpoena served upon it because the subject of inquiry " 'evidences, refers or relates to' federal state or local tax returns [which] were either provided to [Andersen] or generated by [Andersen] for the purpose of facilitating the preparing of the returns." These descriptions of documents which the accountants do not want reproduced closely resemble or fit squarely within the description of the workpapers the Supreme Court found were properly discoverable in *Arthur Young & Co.*

In rejecting the argument that fundamental fairness precludes disclosure of the accountant's tax accrual workpapers to the IRS, the Supreme Court maintained that "if the SEC itself, or a private plaintiff in securities litigation, sought to obtain the tax accrual workpapers at issue in this case, they would surely be entitled to do so

.... [N]o sound reason exists for conferring lesser authority upon the IRS than upon a private litigant suing with regard to transactions concerning which the public has no interest." *Id.* at ———-———, 104 S.Ct. at 1504.

### 3. *Relevancy*

GHR and its accountants admit that "in addition to factual matters, the tax return information contains the impressions, judgments, and opinions of Debtors' accountants concerning existing or potential disputes with the IRS," but claim that the Banks have not demonstrated that this material is clearly relevant to its actual tax liability in order "to override the public policy favoring confidentiality." They also assert that since the Banks have access to the books and audit workpapers, the Banks should be able to make a determination of GHR's tax liability without copies of the workpapers. While GHR and its accountants concede that the workpapers "in most instances facilitate that process," they contend "they are neither necessary nor sufficient to it." They also maintain that "[t]he only other ground for arguing that the return preparation files are relevant to an issue of legitimate interest to the Banks is that they may shed some light on the validity of the IRS' claim for taxes and penalty."

The Supreme Court affirmed that part of the Second Circuit's opinion in *United States v. Arthur Young & Co.*, 677 F.2d 211 (2nd Cir.1982), which held that the tax accrual workpapers were relevant to the investigation of tax liability if they " 'might have thrown light upon' the correctness" of the tax returns. *Arthur Young & Co., supra,* —— U.S. at ——, 104 S.Ct. at 1501.[11] The Court added: "The language 'may be'

[in 26 U.S.C. § 7602] reflects Congress' express intention to allow the IRS to obtain items of even *potential* relevance.... [T]he Service therefore should not be required to establish that the documents it seeks are actually relevant in any technical evidentiary sense."[12] *Id.* at ——, 104 S.Ct. at 1501 (emphasis in original). That the workpapers were not actually used to prepare tax returns did not bar a finding of relevance. *Id.*

GHR and its accountants reiterate that since the Banks have access to most of the files and documents at issue, it is not necessary that copies be furnished. However, while acknowledging the sensitive nature of this information, the *Arthur Young & Co.* Court emphasized that the relevancy of such information can hardly be determined "until it is procured and scrutinized." *Id.* at ——, 104 S.Ct. at 1501. While access may be sufficient for some purposes, it is not sufficient in this case; the Banks desire copies of documents not only for purposes of closer analysis, but also for possible use as evidence. For example, the Banks should be provided with a complete copy of the 1983 financial statement in the event the information contained therein could be used as evidence in determining whether or not a trustee should be appointed.[13] It is beyond argument that financial statements of a corporation undergoing bankruptcy contain information that is essential to ascertaining a debtor's financial viability and forecasting future prospects. The Supreme Court also concluded that "[t]o insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a

---

**11.** *See also Arthur Young & Co. supra,* at —— n. 11, 104 S.Ct. at 1500 n. 11 for cases cited by the Court which emphasize wide acceptance of this relevancy standard among the Courts of Appeal.

**12.** 26 U.S.C. § 7602 provides, in pertinent part: § 7602. Examination of books and witnesses. For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or

the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized— (1) To examine any books, papers, records, or other data which *may be* relevant or material to such inquiry; ... (emphasis added).

**13.** *See also, e.g., supra* note 4.

disinterested analyst served with public obligations." [14]  *Id.* at ——, 104 S.Ct. at 1503.

An independent accountant's responsibility is greater in this case than it may be in many others because the corporation whose tax liability and financial data are at issue has filed for protection under the bankruptcy laws. This information must be examined in order to determine the extent to which the estate may be liable to creditors and the assets which will be available to pay claims of the estate. As the Supreme Court in *Arthur Young & Co.* stated, when competing interests are balanced, "the need ... for full disclosure of all information relevant to tax liability must also weigh in the balance." *Id.* —— U.S. at ——, 104 S.Ct. at 1505.

■ Among other reasons, the Banks are seeking the tax workpapers in order to evaluate the position taken by the IRS with regard to tax liability of GHR. The Court, therefore, finds that the workpapers are relevant under the relevancy test set forth in *Arthur Young & Co.*

### 4. Prejudicial Effect

GHR claims that the Banks' factual and legal analysis of the workpapers may provide the IRS with information that would cause it to harden its settlement position, to increase or amend its claim, or aid the IRS in the pending litigation.[15] Since the

IRS has not sought to discover any such information from the Banks, that argument is speculative at best. Most importantly, GHR ignores the obvious fact that it would be detrimental for the Banks to aid the IRS since it would be against their interests if GHR's tax liability is increased. Additionally, as is clear from the holding in *Arthur Young & Co.*, the IRS is entitled to obtain the same information being sought by the Banks directly from the accountants.

GHR argues that reproducing the workpapers is also prejudicial to the interests of the unsecured creditors. It should be noted that the unsecured creditors' committee demonstrated its support of the Banks' position by filing its opposition to GHR's motions on March 19, 1984. The intrusiveness of the demands for production of certain workpapers is recognized just as the Court in *Arthur Young & Co.* recognized the administrative sensitivity of the IRS in this regard. The protective orders entered address these concerns and specifically prohibit the disclosure of certain information by the Banks. *See, e.g.,* the stipulated protective order entered September 12, 1983.[16]

The Court further finds that the disputed documents contain information that is both relevant and fundamental to an understanding of GHR's financial condition, ac-

---

**14.** A commentator discussed the recent case of *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138 (1983), which involved accountant liability to third parties for negligence:

   The New Jersey Court referenced the auditor's role as an independent scrutinizer of the company's financial statement. That independence arises out of the need for persons other than the company's management to be assured that management's accounting is fair. Thus, the Court concluded, the auditor expects that his independent review will be relied upon by third party investors, stockholders and lenders.

Leibensperger, "The Erosion of *Ultramares:* Expansion of Accountants' Liability to Third Parties for Negligence," 69 Mass.L.Rev. 54, 56 (1984). *See also,* AICPA, *Code of Professional Ethics: Concepts of Professional Ethics,* ET § 51.04 (1977) ("The ethical Code ... emphasizes the profession's responsibility to the public ...."), *cited in Leibensperger, supra.*

**15.** The IRS has filed unsecured priority claims totaling $249,604,566 for additional taxes and prepetition interest allegedly due from GHR for its fiscal years ended July 31, 1974 through July 31, 1983. An unsecured general claim for fraud penalties totaling $12,186,979 for fiscal 1974 was also filed by the IRS. Three of the five allegations of fraud were dismissed by this Court on March 28, 1980, and the other two issues were narrowed for trial. An appeal of the order of March 28, 1980 is now pending before the United States District Court for the District of Massachusetts.

**16.** *But Cf. SEC v. Jerry T. O'Brien, Inc.,* —— U.S. ——, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1984) ("when a person communicates information to a third party even on the understanding that a communication is confidential, he cannot object if the third party conveys that information or records thereof to law enforcement authorities") (citing *United States v. Miller,* 425 U.S. 435, 443, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976).

counting controls and potential tax liability. Coopers' 1983 workpapers contain the most current information regarding GHR's financial condition, and even if these documents are incomplete or in draft form, the Court finds the need for production at this time to be compelling enough to overcome the defenses raised. Therefore, the Banks shall be given the opportunity to procure copies of the documents for analysis and for possible use as evidence in these proceedings. The court having jurisdiction of these cases will determine, when called upon, the admissibility and weight to be accorded specific documents.

## ORDER

Upon consideration by the Court of the pleadings submitted and the arguments of counsel, and in accordance with the foregoing, it is hereby ORDERED:

1. The following 1981 and 1982 workpapers of Coopers described above and withheld from copying by Coopers shall be reproduced forthwith:

(a) MAPs (Matters for Attention of Partners);

(b) Audit Strategy Documentation;

(c) 1982 Representation Letter;

(d) Report Makeups;

(e) Various Cycle Testing and CAAG (Computer Audit Assistance Group) Testing material to the extent such material relates directly to GHR or aids in interpreting workpaper flowcharts and tests selected transactions of GHR.

(f) Permanent Systems Procedures Testing Materials and Internal Control Questionnaire to the extent they relate directly to GHR or aid in interpreting workpaper flowcharts and test selected transactions of GHR.

2. The 1983 workpapers shall be released forthwith for copying by the Banks. Documents considered incomplete or in draft form shall be so designated; their finality or lack of finality will bear upon the weight that may be accorded them if offered into evidence.

3. Documents similar to those which have been or are to be produced in copy form by Coopers shall be so produced by Andersen and Peat, Marwick, along with any other workpapers which conform with those described by the Supreme Court in the case of *Arthur Young & Co., supra.* Peat, Marwick shall also include workpapers relating to federal, state and local tax returns, audit memoranda and material relating to deficiency claims.

4. The Court finds it has not been sufficiently demonstrated that Andersen's retention policy for the years 1974 to present is relevant at this time and, therefore, documents relating thereto need not be produced. Andersen's motion for a protective order is otherwise denied.

5. The cost of copying the documents to be produced shall be borne by the Banks.

6. GHR's motions to quash subpoenas to Coopers and Andersen and to vacate this Court's February 10, 1984 order for the production of documents by Peat, Marwick, and for protective orders, are hereby denied.

7. The order of February 23, 1984, staying the February 10, 1984 order directing Peat, Marwick to produce documents, is hereby vacated.

8. Those documents determined by the parties to contain confidential information may be protected in the same manner as others are protected by the stipulated protective order this Court entered on September 12, 1983 and by this order shall be deemed to be included therein.

SO ORDERED.