[No. 19352-7-III. Division Three. February 28, 2002.]

MICRO ENHANCEMENT INTERNATIONAL, INC., *Appellant*, v. COOPERS & LYBRAND, L.L.P., ET AL., *Respondents*.

414

416

*David D. Hoff* and *Janissa A. Strabuk* (of *Tousley, Brain, Stephens, P.L.L.C.*), for appellant.

*Stephen L. Farnell* and *Kevin J. Curtis* (of *Winston & Cashatt, P.S.*); and *Evan L. Schwab, Curt R. Hineline*, and *Margarita V. Latsinova* (of *Dorsey & Whitney*), for respondents.

SWEENEY, J. — This accounting malpractice case was tried to a jury on contested facts and theories of law over the course of a seven and a half week trial. The accountants won.

Micro Enhancement International, Inc., (MEI) is a software company that was looking to float an initial public offering of stock. Its theory of the case was essentially that it would have successfully sold its initial public offering except for delays caused by the incompetence and misrep-

resentations of its public accountants, Coopers & Lybrand (now PricewaterhouseCoopers), and its Spokane principal, Gordon Budke (hereafter collectively referred to as Coopers).

Coopers' theory of the case is essentially that it competently discharged its responsibilities in auditing MEI's financial statements and provided timely financial advice, considering the circumstances. But even if it did fail to timely or competently advise, these failures did not undermine MEI's initial public offering. The failure of the offering resulted instead from MEI's precarious financial position, its inability to market its main product (Share Builder), or the incompetence and lack of regulatory qualification of its underwriter, J.E. Liss & Company.

A jury found against Coopers and Mr. Budke on negligence and against Coopers on breach of contract. But the jury also found that there was no causal relationship between the damages sustained by MEI and the negligence or breach of contract.

These questions structure our discussion on appeal:

(1) Whether the trial court erred by allowing the jury to consider the negligence of MEI's underwriter, J.E. Liss & Company—an entity MEI did not sue.

(2) Whether the trial court erred by instructing the jury on superseding intervening cause *not* attributable to the defendants as the sole proximate cause of MEI's damages.

(3) Whether the trial court should have allowed MEI to amend its complaint three days before trial or, at the close of its case, to add an additional cause of action against Coopers for breach of a fiduciary duty.

(4) Whether the court should have allowed MEI to present its negligent misrepresentation claim to the jury.

(5) And whether Coopers' failure to notify MEI that it considered MEI a high-risk client violated the Consumer Protection Act.

We conclude that (1) MEI failed to argue the reasons it now argues on appeal to support its objection to the

inclusion of J.E. Liss & Company as an entity against whom the jury could find fault; (2) the court properly instructed the jury on superseding intervening cause in light of substantial evidence that other nonconcurrent causes besides the negligence of Coopers proximately caused MEI's damages; (3) the trial judge did not abuse his considerable discretion in denying MEI's motion to add an additional claim for breach of fiduciary duty. And MEI failed to show that Coopers owed such a duty in any event. (4) The court properly rejected MEI's negligent misrepresentation claim as unsupported by any evidence; and, (5) the contractual relationship between these sophisticated commercial enterprises did not have the capacity to deceive the consuming public and did not therefore implicate the Consumer Protection Act.

In the unpublished portion of the opinion, we address numerous assignments of error to rulings on evidence made by the trial judge. We find tenable grounds and tenable reasons for each ruling and therefore no abuse of discretion. Accordingly, we affirm the judgment. We also dismiss without reaching the merits a cross-appeal by Coopers in which it claims the trial court erred in certain evidentiary rulings.

## FACTS

HISTORY

MEI is a Spokane-based software company. For several years, it successfully developed and marketed bar-code scanning products used for grocery store inventory control and pricing. In 1992, MEI began developing a new patented kiosk marketing system called Share Builder. MEI intended that Share Builder replace paper grocery coupons and reward frequent shoppers.

By the fall of 1994, MEI focused its entire competitive strategy on developing and marketing Share Builder. But MEI needed capital to fund Share Builder, so MEI planned an initial public offering (IPO) of stock.

Chief Executive Officer (CEO) Timothy Staples hired Spokane's only Big 6 firm, Coopers & Lybrand, to audit MEI's financial statements for stock registration purposes. Coopers promised prompt, local decision making by Mr. Budke and the use of national consultants as needed to ensure appropriate service. Coopers immediately designated MEI as a high-risk client and placed it on a "Special Attention List." Report of Proceedings (RP) at 1460-61. But it did not tell MEI. The special attention designation meant Coopers would perform additional procedures and reviews for internal risk management purposes and this would result in additional expense to MEI.

Coopers expected to deliver its 1993 and 1994 audit report by April 14, 1995. But Coopers and MEI disagreed over what Coopers viewed as MEI's overly aggressive positions on the recognition of income. Coopers also disagreed with MEI over recognition of other assets and allocation of expenses. Finally, they disagreed into the fall of 1995 over whether MEI's 1994 year-end financial statement had to include a "going concern" paragraph—an expression of doubt by the auditor that MEI would remain in business beyond one year.

Mr. Staples finally agreed to include the going concern paragraph in the 1994 financial statements. But the disagreement over "going concern" and related footnotes delayed a scheduled November 20, 1995, filing of the Securities and Exchange Commission (SEC) registration statement for the IPO.

THE UNDERWRITER

Jerome Liss is a Milwaukee investment banker. His brokerage firm is J.E. Liss & Company (Liss). MEI *agreed* with Liss to *agree* at some future date to underwrite by "firm commitment" 1,000,000 shares of MEI common stock at an anticipated offering price of $5 per share. In a "firm commitment" underwriting, the underwriter becomes personally obligated to purchase the stock upon effectiveness of the registration statement. This is as opposed to a "best efforts" underwriting, where the issuing company, not the

underwriter, bears the risk of the underwriter's inability to sell the stock.

Mr. Liss was a veteran at "best efforts" stock offerings. He hoped to take his company to another level by making the MEI offering his first "firm commitment" underwriting. Mr. Liss claimed $3.5 million personal net worth and a staff of in-house brokers with large client bases gave him the financial wherewithal to underwrite the MEI offering. But he actually intended to form an underwriter syndicate to make the commitment to purchase the stock. This would help him break into the closed fraternity of firm commitment underwriters.

On March 6, 1996, Liss and MEI executed a formal underwriting agreement. Liss represented that his firm had the authority to act as lead underwriter of the "several underwriters" named in the agreement. But there were no other underwriters named in the agreement; none were yet enlisted. CEO Staples nonetheless believed that the agreement would ultimately obligate Liss on a "firm commitment" basis to purchase the entire 1,000,000-share offering. But the agreement contained an escape clause. The clause allowed Liss to abandon the offering without penalty at any time before effectiveness of the registration statement.

Any commitment by Liss was then illusory.

Ultimately, in December 1996, Mr. Liss sent MEI a letter withdrawing from the IPO. He claimed that his inability to obtain financial information due to Coopers' excessive delays was "most distressing." Ex. 943.

SEC REGISTRATION

MEI filed its SEC registration statement on December 19, 1995, after it received the audited 1993 and 1994 financial statements. The offering anticipated sale of 1,000,000 shares of common stock at an offering price of between $5.00 and $7.50 per share, to be underwritten by Liss. MEI represented that it expected significant revenue growth in 1996 and 1997 from Share Builder installations in possibly 100 additional grocery stores for existing cus-

tomer Roundy's. The registration statement did contain a going concern paragraph, but with accompanying explanations. The registration statement also warned prospective investors that MEI had losses for 1993, 1994, and the nine months ending September 30, 1995. And it further warned that generating revenue, obtaining financing, or succeeding in an intensively competitive market was uncertain.

The SEC responded with a comment letter requiring explanation by April 24, 1996, on 43 items in the registration statement. Three items required comments on accounting issues by Coopers; one expressed concern about Liss:

> According to SEC records, the Underwriter [Liss] has participated in only one other registration statement declared effective by the SEC. Assuming the foregoing is accurate, please include a separate risk factor concerning the relative inexperience of the Underwriter in public offerings of the nature contemplated by the Registration Statement. Please request the Underwriter to supplementally provide the staff with a letter representing that as of the date of effectiveness of the Registration Statement, it will meet the net capital requirements and all other applicable rules and regulations of the Commission.

Ex. 602, at 4.

Robert Philipp served as securities counsel for both Liss and MEI. He filed a response to the SEC on April 22, but answered or referenced only 6 of the SEC's 43 concerns. He represented that Liss would prepare a response to the underwriter inquiry later and submit it with the amended registration statement.

NCR Contract

In late February 1996, MEI was the winning bidder with government contractor National Cash Register (NCR) to install hardware and software systems in approximately 300 Department of Defense commissaries. MEI received the purchase orders on March 12 for $2.8 million worth of software—half for Share Builder. The contract was payable in three installments—50 percent ($1.4 million) upon deliv-

ery of the software in 1996, 25 percent in 1997, and 25 percent in 1998. This was MEI's biggest sale ever.

Coopers delayed delivery of MEI's financial statements because immediate recognition of the NCR revenue would dramatically improve MEI's financial condition and likely eliminate the "going concern" paragraph. MEI thus no longer wanted Coopers to issue the 1995 financial statements on a "stand-alone" basis. RP at 4708. MEI instead requested that Coopers "review" the first quarter 1996 financial statements to include them in an amended registration statement along with the 1995 statements. A "review" differs from an "audit." An audit contains outside or third party confirmations of a company's financial representations. A review does not. The purpose of a review is to add credibility to the financial statements.

STATEMENT OF POSITION 91-1

MEI and Coopers then haggled back and forth over how much of the NCR revenue could be immediately recognized, i.e., shown on the balance sheet as income. The question turned on application of a complex accounting pronouncement, Statement of Position (SOP) 91-1.

SOP 91-1 does not permit a business to recognize revenue if significant contract contingencies remained. For example, revenue cannot be recognized if the master copy, or "gold master," of the software has not been delivered or if the vendor and purchaser are involved in a material contract dispute. And all of this information must come from the client—MEI. Its chief financial officer, Kelly MacDonald, represented to Coopers that all software delivery to NCR was completed in March.

Mr. MacDonald interpreted SOP 91-1 to mean MEI could immediately recognize the entire $2.8 million as revenue. Coopers at first agreed, but later, after consulting with its own experts, concluded that only 50 percent of the revenue could be immediately recognized. A few days later Coopers agreed to 75 percent.

By mid-May, Coopers determined the going concern could be eliminated in view of the NCR contract and MEI's recent

conversion of bond debt to equity so as to show less short-term liability. But MEI continued to disagree with Coopers on the NCR revenue recognition issue. MEI declined Coopers' offer to resolve the matter in a prefiling conference with the SEC. Coopers' offer was contingent upon MEI providing confirmations that no contingencies remained in the NCR contract and all software delivery was complete by March 31. Coopers completed its fieldwork by June 10. But it could not finalize the review until June 13 because of the need for documentation.

Coopers delivered the promised statements on June 21, 1996. The statements did not contain a going concern. Under SEC "staleness" rules,[1] MEI had until August 13, 1996, to file its amended registration statement using these financial statements. In late June, Mr. Staples requested that Coopers "review" MEI's second quarter financials because he was advised that impending losses would likely generate SEC inquiry about material differences from the first quarter.

MEI and Liss then extended the about-to-expire underwriting agreement to October 31, 1996. The "syndicate" Liss contemplated forming in December 1996 was not actually in place, but he still planned to assemble it. MEI hoped to file the amended registration statement to be effective on either July 15 or 22.

MEI also needed cash immediately to continue marketing Share Builder. So in early July, MEI assigned the second two installments of the NCR contract totaling $1.4 million to a factoring company, Softech Financial, for $1.1 million. This in turn required that Coopers study the assignment's financial effect. But MEI did not submit the necessary documents for that study until after July 29. And then the Softech assignment contract reflected a contingency clause.

---

[1] Under the SEC staleness rules, financial statements that must be disclosed to the public may not be dated more than 135 days before the planned date of effectiveness of the stock offering. Public companies must report financial information every 90 days and the quarterly statement must be completed no more than 45 days after the end of the quarter. RP at 6632-33.

Coopers first concluded the SEC would require the transaction to be reported as a "financing arrangement," not revenue recognition. Again Coopers wanted to study the issue. Mr. Staples claimed that Coopers' protracted consideration of this issue was delaying the IPO. After a consultant meeting, Coopers reversed its decision and agreed that the assignment could be listed as revenue. Coopers finally received other needed documents from MEI in early October. It submitted the second quarter review to MEI on October 24. MEI soon replaced Coopers with another accounting firm.

Liss subsequently withdrew. And the IPO was never filed.

PROBLEMS SELLING SHARE BUILDER

MEI's sales force traveled the country making presentations to manufacturers and retailers. A major grocery store chain, Food Lion, expressed interest, but did not start a 10-store test because it was unwilling to accept MEI's requirement that it pay up-front leasing costs. MEI's original marketing plan had been that each grocery store would have to invest approximately $50,000 to purchase a complete Share Builder system. That cost proved prohibitive. So MEI shifted to a lease program. The retailer would be responsible for the lease and be reimbursed by MEI, depending on the amount of revenue that MEI received from manufacturers. But competitors offered their systems to the retailer either free or at a lower cost. The NCR contract was MEI's last Share Builder sale. And MEI mutually parted ways with its only other Share Builder customer—Roundy's.

By mid-1997, MEI was in dire financial straits and needed to cut costs and increase sales. CEO Staples resigned in September 1997. The company ultimately reduced its workforce from 86 to 18 employees. In September 1997, the new CEO, John Molloy, said the company had "no money to pay anything." RP at 3810.

COURT PROCEEDING

On September 18, 1997, MEI sued Coopers and Mr. Budke, alleging professional negligence, breach of contract,

fraud, negligent misrepresentation, and violation of the Consumer Protection Act (CPA). Coopers filed a counterclaim for breach of contract, seeking its unpaid professional fees from MEI.

Before trial, the court summarily dismissed MEI's claims for fraud, negligent misrepresentation, and violation of the CPA. The court also denied MEI's motion to amend the complaint (less than a week before trial) to add a claim of breach of fiduciary duty. RP (Aug. 6, 1999) at 117-20. On August 9, 1999, the case went to trial on MEI's professional negligence and breach of contract claims, and on Coopers' breach of contract counterclaim.

MEI's theory of the case was that numerous mistakes, excessive and unnecessary use of consultants, and undue delays in providing financial statements by Coopers and Mr. Budke caused Liss to withdraw and the IPO to fail. Coopers' theory was that the IPO failed due to problems with the product, MEI's precarious financial condition, and Liss's incompetence. Both presented abundant evidence to support either theory.

TRIAL

The parties presented competing substantial evidence on whether Liss possessed the regulatory qualifications and sufficient capital (per SEC rules) to handle MEI's offering.

They also presented competing substantial evidence as to whether Liss was negligent in handling the IPO process. Coopers presented evidence and argued that Mr. Liss and his company were absent from the process, incompetent, and, generally, in over their heads.

Coopers also presented evidence and argued that attorney Robert Philipp was negligent and in a conflict position by representing both MEI and Liss. MEI planned to go ahead with the offering to be effective July 15 or 22. But Liss would then have been firmly obligated to pay $4.5 million whether or not it had any investors. So MEI's and Liss's interests conflicted because MEI wanted the money immediately for its Share Builder program.

MEI presented extensive evidence that Coopers should have gone along with recognition of the entire $2.8 million for NCR revenue right away. But the court also allowed Clifford Pike, Coopers' accounting expert, to render an opinion, not previously disclosed, that no NCR revenue could have been recognized in the first or second quarter of 1996. This was done after Mr. Pike saw certain MEI documents for the first time on the weekend before he was to testify. These included MEI's April 5 and 10, 1996, executive staff meeting minutes, indicating NCR was holding up money on the contract because MEI had not delivered the master source code for Share Builder.

In addition, an August 5, 1996, letter from Mr. Staples to Rod Osborne of NCR showed a contract dispute over whether MEI had granted NCR unrestricted rights to certain Share Builder software. MEI objected that they were being ambushed by a new fraudulent concealment claim in the middle of trial.

The court gave the jury a superseding intervening cause instruction. MEI objected. It argued that no substantial evidence supported the notion that the sole proximate cause of MEI's damage was the intervening act of a nonparty or other cause. And a superseding cause must occur after the negligence of the defendants, and any negligence by Liss, Mr. Philipp, or MEI was concurrent with the defendants' negligence.

The court included Liss and Mr. Philipp as empty chairs on the negligence portion of the special verdict form. MEI objected that the verdict form was confusing and again no substantial evidence supports that Liss or Mr. Philipp was negligent.

The jury found that Coopers, Mr. Budke, Liss, Mr. Philipp, and MEI were all negligent. The jury also found against Coopers on breach of contract. But it also found that MEI suffered no damages from either Coopers' or Mr. Budke's negligence or breach of contract. The jury also rejected Coopers' breach of contract counterclaim for ap-

proximately $199,786 in unpaid fees. The court denied MEI's motion for new trial.

## EMPTY CHAIR

Central to MEI's appeal is its assignment of error to the trial court's decision to include J.E. Liss & Company in the special verdict form as an entity against which the jury could assign fault. MEI's argument on appeal is that its relationship with Liss was exclusively contractual and therefore Liss was not amenable to suit in tort. The jury could not then assign any "fault" to Liss. *Gilbert H. Moen Co. v. Island Steel Erectors, Inc.*, 128 Wn.2d 745, 912 P.2d 472 (1996). And the economic loss rule would preclude suit by MEI against Liss in any event. *Berschauer/Philipps Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 821, 881 P.2d 986 (1994). We reject the assignment of error.

OBJECTION WAIVED

■ A lawyer must "state distinctly the matter to which he objects and the grounds of his objection" when objecting to the giving of any instruction. CR 51(f); *see Trueax v. Ernst Home Ctr., Inc.*, 124 Wn.2d 334, 338-39, 878 P.2d 1208 (1994). And this includes any special verdict forms. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 126 Wn.2d 50, 63, 882 P.2d 703, 891 P.2d 718 (1994). This gives the trial court a chance to change positions and thereby avoid the necessity of a second trial. *Trueax*, 124 Wn.2d at 339.

The lawyer must offer a correct statement of the law to preserve the objection for appeal. *Haslund v. City of Seattle*, 86 Wn.2d 607, 547 P.2d 1221 (1976). We look at the objection and its context when passing on whether an objection is sufficient. And we do not consider statements made in a motion for new trial, on reconsideration, or on appeal. *Trueax*, 124 Wn.2d at 340 (citing *Bitzan v. Parisi*, 88 Wn.2d 116, 125, 558 P.2d 775 (1977)).

Here, MEI's counsel made specific and detailed objections to several jury instructions. Counsel objected to the special verdict form on the grounds that it was redundant and

therefore confusing and that there was no substantial evidence to support a negligence claim against Liss or Mr. Philipp:

> The plaintiffs object to the special verdict form given to the jury with respect to MEI's claims. We object to this form for several reasons.
>
> First it is very prejudicial as it requires under each part—it requires the jury to make a proximate cause finding three times for each claim.
>
> This is a confusing instruction because of this *redundancy*. And MEI submits that their proposed special verdict form is a superior form, in that it fairly conveys the law and explains the law to the jury in a more concise, easy to understand manner.
>
> We also object to the special verdict form on the basis that it includes J.E. Liss & Company and Robert Philipp as non-parties for whom a jury may allocate fault to.
>
> *There's been no substantial evidence presented in this case that any of the alleged negligence on the part of J.E. Liss & Company and Mr. Philipp contributed to the damages that MEI sustained.*
>
> MEI objects to the *failure to give their special verdict form*, which is a superior and more readily understandable form.[2]
>
> . . . .
>
> We also except to the special verdict form on MEI's claims, specifically question number one under part A which reads, "Were any of the following negligent: Answer yes or no for any of the persons or entities listed below."
>
> And then there's a list that contains defendants, plaintiff, J.E. Liss & Company, and R. Philipp.
>
> *We submit that this is a confusing instruction, which leads the jury to believe that we have somehow brought claims against J.E. Liss & Company or Mr. Philipp and is confusing in that nature.*

RP at 7820-23 (emphasis added).

The court ruled:

---

[2] MEI's proposed special verdict form did not include Liss or Mr. Philipp. It also did not recite legal authority for their exclusion. Clerk's Papers (CP) at 1058.

As to the empty seats, the Court concluded and still feels that there was sufficient evidence in this case to allow the listing of nondefendants, those being Mr. Liss and Mr. Philipp.

RP at 7828.

MEI's objection at trial differs from its assignment of error here on appeal. *See* Appellant's Br. at 31-38.

■ ■ MEI argues, nonetheless, that it preserved its objection in an unrecorded instruction conference prior to closing arguments. As part of MEI's motion for new trial, the parties submitted competing affidavits as to whether MEI's counsel had earlier specifically objected that Liss could not be an empty chair because it could not be sued in tort. One of Coopers' affidavits states that MEI's objections in chambers were limited to objections it subsequently made on the record.

MEI relies on *Wickswat v. Safeco Insurance Co.* for the proposition that it properly objected. *Wickswat v. Safeco Ins. Co.*, 78 Wn. App. 958, 967-68, 904 P.2d 767 (1995). But there the parties agreed that the discussion occurred. Here, they do not. And the court had no independent recollection whether MEI's counsel raised this specific issue in chambers. And unlike another case cited by MEI, *Crossen v. Skagit County*, MEI did not sufficiently apprise the trial court of the nature and substance of its objections now made on appeal. *Crossen v. Skagit County*, 100 Wn.2d 355, 358, 669 P.2d 1244 (1983). The court included Liss as an empty chair since both sides presented evidence pertaining to Liss's negligence.

The recorded exceptions to instructions are then paramount. *Trueax*, 124 Wn.2d at 340; *Bitzan*, 88 Wn.2d at 125. There is nothing else for us to review. MEI did not object at trial on the ground it now seeks to raise on appeal. The special verdict form including Liss as an empty chair is then the law of the case. *See also Agranoff v. Morton*, 54 Wn.2d 341, 346, 340 P.2d 811 (1959) (a party is not permitted to wait and speculate on chances for a verdict and then raise objections that should have been raised during trial).

■■ Moreover, both parties offered expert opinions on the question of whether Liss met the standard of care for underwriters. Coopers identified Liss as a nonparty at fault under CR 12(i) in its answer to MEI's second amended complaint. MEI did not try to exclude or restrict the testimony of Coopers' expert on Liss's fault. Nor did MEI ask to limit consideration of the reasonableness of Liss's actions just to a contract theory. And "[a]bsent a request for a limiting instruction, evidence admitted as relevant for one purpose is considered relevant for others." *Lockwood v. AC&S, Inc.*, 44 Wn. App. 330, 344, 722 P.2d 826 (1986) (citing ER 105 & cmt.), *aff'd*, 109 Wn.2d 235, 744 P.2d 605 (1987). The court then properly ruled there was substantial evidence presented on the tort theory of Liss's negligence and percentage of fault.[3] *See* RCW 4.22.070(1).

## SUPERSEDING INTERVENING CAUSE

MEI next argues that the court should not have given a superseding intervening cause instruction because again there was no evidence of negligence, other than Coopers', and Liss's obligations were contractual.

STANDARD OF REVIEW

■ When, as here, there is no dispute that a jury instruction correctly states the law, the court's decision to give the instruction will not be disturbed absent an abuse of discretion. *Cramer v. Dep't of Highways*, 73 Wn. App. 516, 520, 870 P.2d 999 (1994). Discretion is abused only when it is exercised in a manifestly unreasonable manner or on untenable grounds. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

THE INSTRUCTION

■■ "Whether an act may be considered a superseding cause sufficient to relieve a defendant of liability depends

---

[3] We reject as without merit MEI's additional contention that the jury was misled and thus prejudiced against MEI by the court's placement of the negligence claim first on the special verdict form. MEI makes no such showing. The jury is presumed to have followed the court's instructions. *See, e.g., State v. Lough*, 125 Wn.2d 847, 864, 889 P.2d 487 (1995).

on whether the intervening act can reasonably be foreseen by the defendant; only intervening acts which are *not* reasonably foreseeable are deemed superseding causes." *Anderson v. Dreis & Krump Mfg. Corp.*, 48 Wn. App. 432, 442, 739 P.2d 1177 (1987). An intervening act may be so highly extraordinary or unexpected as to fall outside the realm of reasonable foreseeability as a matter of law. *See Smith v. Acme Paving Co.*, 16 Wn. App. 389, 396, 558 P.2d 811 (1976). But generally the question whether an independent cause is reasonably foreseeable is a question for the jury. *McCoy v. Am. Suzuki Motor Corp.*, 136 Wn.2d 350, 358, 961 P.2d 952 (1998); *Cramer*, 73 Wn. App. at 521; *see also* RESTATEMENT (SECOND) OF TORTS § 453 cmt. b (1965) (when undisputed facts leave room for reasonable difference of opinion, question whether intervening act was foreseeable is for the jury). A superseding cause generally must occur after, and not concurrent with, the defendant's negligent act. *See Farr v. NC Mach. Co.*, 186 F.3d 1165, 1168 (9th Cir. 1999).

■ MEI presented substantial evidence that Coopers and its principal, Mr. Budke, were negligent. Coopers delayed the issuance of its 1993 and 1994 financial statements, in part, because it insisted on requiring a going concern paragraph that was unwarranted, according to MEI. Also, according to MEI, Coopers failed to timely deliver the audited 1995 financial statements and unnecessarily used consultants on the NCR revenue recognition and other issues causing delay of the financial reports until June 21.

Coopers also unnecessarily consulted and delayed resolving the Softech assignment issue. Consequently, Coopers did not issue the MEI second quarter review until two months after the August 13 SEC staleness date for filing an amended registration statement. MEI also says Mr. Budke was negligent in June 1996 for backdating critical documents to show compliance with SEC rules.

But the jury found that none of the actions of Coopers or Mr. Budke proximately caused any damage to MEI. And

there was ample evidence that MEI and its principals were responsible for delays in filing the amended registration statement. For example, it withheld the NCR delivery and software dispute information from Coopers. This could explain why MEI decided not to seek an SEC prefiling conference in April 1996, despite Coopers' strong recommendation based upon its consultants' experience. And according to Coopers' evidence, Mr. MacDonald failed to timely submit the critical Softech assignment documents to Mr. Budke in July 1996.

There was also evidence that Liss failed to qualify to underwrite the IPO and therefore could not have completed it anyway. The jury could also have determined that MEI's decision to request a second quarter 1996 review before filing the amended registration statement was based on ill-advised recommendations of either Mr. Liss or Mr. Philipp. Coopers presented evidence that neither was prepared to immediately file the amended registration statement in any event. Coopers also presented an expert opinion that a second quarter review was unwarranted because the amended registration statement itself would have adequately disclosed MEI's financial situation to the SEC.

The jury could well have determined from the evidence that MEI missed its last viable opportunity to file the offering between June 21 and August 13 due to a combination of the actions of MEI, the Liss/Philipp recommendations, Liss's failure to qualify to do the offering or to have a syndicate in place, Mr. Philipp's failure to keep the relevant IPO documents continually updated so the registration statement would be ready to file quickly, and Mr. Philipp's dual representation of MEI and Liss when MEI needed the IPO funds quickly.

MEI's argument assumes the jury accepted Coopers' and Mr. Budke's negligence and then deemed that negligence to be a proximate cause of MEI's damages. This assumption is unwarranted. The jury could just as easily have determined

that any or all earlier (or subsequent) negligence of the defendants did not proximately cause the IPO to fail.

It was the jury's province to sort out the evidence and decide the final proximate cause of MEI's failure. The superseding intervening cause instruction gave them an opportunity to do just that. And the court properly gave that instruction.

## FIDUCIARY DUTY

MEI next argues that the court erred in refusing to permit it to amend its complaint to add breach of a fiduciary duty. MEI made the motion three days before trial. The court originally granted the motion, but changed its ruling on reconsideration. The court revisited the question after MEI moved to amend to conform the pleadings to the proof at the end of its case. The court again denied the motion.

MEI contends the court's refusal to grant its motion and instruct the jury on breach of fiduciary duty was prejudicial because it precluded MEI from arguing that Coopers and Mr. Budke owed a higher standard of care as fiduciaries.

STANDARD OF REVIEW

CR 15(b) provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." The court's decision on a motion to amend is reviewed for abuse of discretion. *Edmonds v. John L. Scott Real Estate, Inc.*, 87 Wn. App. 834, 852, 942 P.2d 1072 (1997).

FIDUCIARY RELATIONSHIP

In a fiduciary relationship one party " 'occupies such a relation to the other party as to justify the latter in expecting that his interests will be cared for.' " *Liebergesell v. Evans*, 93 Wn.2d 881, 889-90, 613 P.2d 1170 (1980) (quoting RESTATEMENT OF CONTRACTS § 472(1)(c) (1932)). Breach of a fiduciary duty imposes liability in tort. The plaintiff must prove (1) existence of a duty owed, (2) breach

of that duty, (3) resulting injury, and (4) that the claimed breach proximately caused the injury. *Miller v. U.S. Bank of Wash.*, 72 Wn. App. 416, 426, 865 P.2d 536 (1994). A fiduciary relationship arises as a matter of law in certain contexts such as attorney and client, doctor and patient, trustee and beneficiary, principal and agent, and partner and partner. But a fiduciary relationship can arise *in fact* regardless of the relationship *in law* between the parties. *Liebergesell*, 93 Wn.2d at 890-91. For example, acting as an advisor may contribute to the establishment of a fiduciary relationship. *Id.*

No Washington case addresses whether a public auditor is a fiduciary of its client. But the weight of authority is that absent *special circumstances*, an auditor is *not a fiduciary* of its client. An *independent* auditor's primary duty is to the public and this is inconsistent with a fiduciary status.[4]

MEI argued that Coopers was a fiduciary because it agreed to serve as MEI's business advisor, who, as a result of the auditing process, would recommend improvements in internal accounting controls, operating controls and policies, inventory controls, and cost accounting systems. And, MEI's argument continues, Coopers immediately assumed that role when it sent a representative to Mexico in early 1995 to advise MEI on whether an account receivable should be written off. MEI followed Coopers' recommendation on that matter. Likewise, Mr. Staples testified that he relied on what Coopers told him and that he trusted Mr. Budke.

---

[4] *See United States v. Arthur Young & Co.*, 465 U.S. 805, 818-19, 104 S. Ct. 1495, 79 L. Ed. 2d 826 (1984); *Franklin Supply Co. v. Tolman*, 454 F.2d 1059, 1065 (9th Cir. 1971); *In re Cendant Corp. Sec. Litig.*, 139 F. Supp. 2d 585, 608-09 (D.N.J. 2001); *Resolution Trust Corp. v. KPMG Peat Marwick*, 844 F. Supp. 431 (N.D. Ill. 1994); *Fed. Deposit Ins. Corp. v. Schoenberger*, 781 F. Supp. 1155, 1157-58 (E.D. La. 1992); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 552 (S.D.N.Y. 1990). *But see, e.g., In re Investors Funding Corp. of N.Y. Sec. Litig.*, 523 F. Supp. 533, 542 n.4 (S.D.N.Y. 1980); *In re DeLorean Motor Co.*, 56 B.R. 936 (Bankr. E.D. Mich. 1986); *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 917 P.2d 222, 233-34 (1996); *Dantzler Lumber & Export Co. v. Columbia Cas. Co.*, 115 Fla. 541, 548, 156 So. 116, 118 (1934).

MEI then contends it presented evidence that Coopers breached fiduciary duties by failing to disclose: (1) that it lacked the expertise necessary to perform the services for which it was retained; (2) that Mr. Budke lacked expertise to make final decisions on technical issues; and (3) that Coopers secretly deemed MEI a high-risk client from the inception of the engagement. Appellant's Br. at 47.

But Mr. Staples' testimony that he trusted Mr. Budke and had confidence in Coopers as MEI's independent advisor is *not* sufficient to create a fiduciary relationship. *Resolution Trust Corp. v. KPMG Peat Marwick*, 844 F. Supp. 431, 436 (N.D. Ill. 1994) (placing trust and confidence in firm as independent advisor insufficient to create fiduciary duty). After all, "[w]e trust most people with whom we choose to do business." *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992).

And more significantly, the thrust of MEI's claim was that Coopers failed as *independent* public auditors hired to provide information to support a *public* stock offering. Independent public auditors serving in this capacity have obligations beyond the immediate interests of their clients. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 818-19, 104 S. Ct. 1495, 79 L. Ed. 2d 826 (1984).

Moreover, the jury already considered all of this evidence and found no proximal relationship in negligence or contract between Coopers' conduct and the loss here in any event. *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983) (error without prejudice is not grounds for reversal, and error is not considered prejudicial unless it affects or presumptively affects the verdict). *See also Kelly v. Foster*, 62 Wn. App. 150, 157-58, 813 P.2d 598 (1991) (court's refusal to grant motion to amend pleadings to assert fiduciary claim for attorney fees not prejudicial when trier of fact already fully considered and ruled on fee request). And so it is difficult to see how a fiduciary duty instruction to the jury would have made a difference anyway.

## NEGLIGENT MISREPRESENTATION

MEI next argues that it was damaged by Coopers' negligent misrepresentation—a claim the court first dismissed on summary judgment and rejected again at the close of MEI's case. MEI relies on representations of the expertise and quality of service made by Coopers in the first meeting between Mr. Budke and Mr. Staples, Coopers' proposal letter, Coopers' representation that all decisions would be made locally and promptly by Mr. Budke, and Coopers' secretly designating MEI a high-risk client.

 A negligent misrepresentation occurs when

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1) (1977); *see ESCA Corp. v. KPMG Peat Marwick*, 135 Wn.2d 820, 826, 959 P.2d 651 (1998). The plaintiff must prove each element of the claim by clear, cogent, and convincing evidence. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 181, 876 P.2d 435 (1994).

 Promises of future conduct may support a contract claim. But failure to perform those promises alone cannot establish the requisite negligence for negligent misrepresentation. A false representation as to a presently existing fact is a prerequisite to a misrepresentation claim. *Id.* at 182; *see also Stiley v. Block*, 130 Wn.2d 486, 505-06, 925 P.2d 194 (1996) (promises of future performance are not representations of existing fact). None of Coopers' representations are of existing fact. They are instead representations of future performance.

Coopers placed MEI on a special attention list. MEI claimed Coopers lacked expertise and authority to make final decisions locally. MEI alleged breach of contract and

professional negligence based upon these same facts. And the jury heard competing evidence and found that none of the complained-of conduct—additional fees, unnecessary consulting, and delays to the IPO—caused the failure of their IPO by either breach of contract or negligence.

How then could MEI have proved a negligent misrepresentation claim at the even higher clear, cogent, and convincing standard of proof? We agree with the trial court. MEI's evidence did not support a negligent misrepresentation claim. The court properly rejected MEI's claim at the close of its proof. CR 15(b); *Edmonds*, 87 Wn. App. at 852. The claim is duplicative at best. *See Havens*, 124 Wn.2d at 180-81 (dismissal as a matter of law proper where evidence of promises underlying negligent misrepresentation claim was same evidence alleged to support failed promissory estoppel claim); *see also Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982) (summary judgment appropriate when the pleadings, affidavits, depositions, and admissions on file demonstrate absence of any genuine issues of material fact and that moving party is entitled to judgment as a matter of law).

## CONSUMER PROTECTION ACT CLAIM

MEI appeals the trial court's summary dismissal of its Consumer Protection Act claim.

STANDARD OF REVIEW

We engage in the same inquiry as the trial court. *Wilson*, 98 Wn.2d at 437. The court must consider all facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Id.* Questions of law are likewise reviewed de novo. *Bishop v. Miche*, 137 Wn.2d 518, 523, 973 P.2d 465 (1999). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c).

CONSUMER PROTECTION ACT

 "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. A private plaintiff must present evidence of each of the following elements to prove a CPA claim: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to the plaintiff in its business or property; and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986); *see also Svendsen v. Stock*, 143 Wn.2d 546, 553, 23 P.3d 455 (2001). When, as here, the parties do not dispute that particular conduct occurred, the question whether those actions give rise to a CPA violation is reviewable as a question of law. *Svendsen*, 143 Wn.2d at 553; *see also Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997).

The parties dispute only the first and third elements.

UNFAIR OR DECEPTIVE ACT (ELEMENT 1)

 Although the trial court ruled MEI failed to provide proof of public interest impact, for us the dispositive question is whether MEI proved Coopers' acts or practices had the capacity to deceive a substantial portion of the public. *Hangman Ridge*, 105 Wn.2d at 785; *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 935 P.2d 628 (1997). And that is a legal question. *Henery v. Robinson*, 67 Wn. App. 277, 290, 834 P.2d 1091 (1992).

 Coopers used standard form language in its proposal to prospective clients; language which guaranteed prompt local decision making. Clerk's Papers (CP) at 50-51. Coopers also sent other letters promising prompt local decision making to eight other potential clients. MEI argues from this that such a standard form proposal has the capacity to deceive others. And the CPA claim should then have gone to the jury. *Henery*, 67 Wn. App. at 291.

But the most MEI showed was that Coopers was in contact with eight other *unidentified* recipients of proposal letters that may have included similar promises. It made no

showing that Coopers' placement of MEI on the special attention list had the capacity to deceive or deceived anyone other than MEI. And we find nothing in this record beyond MEI's speculation that Coopers directed proposals with the capacity to deceive to a *substantial portion of the public*. *See Pelton v. Tri-State Mem'l Hosp.*, 66 Wn. App. 350, 355, 831 P.2d 1147 (1992) (opposition to summary judgment cannot succeed based on mere speculation or possibility).

MEI relies on a number of cases,[5] but in each instance a substantial portion of the public was at risk. MEI failed to present evidence from which a reasonable trier of fact could conclude Coopers committed an unfair or deceptive act or practice that could deceive a substantial portion of the public. So it is for lack of proof on that element that we affirm the trial court's dismissal of the consumer protection claim. *See Hangman Ridge*, 105 Wn.2d at 780 (lack of proof on any one element defeats a consumer protection action); *Heath v. Uraga*, 106 Wn. App. 506, 515, 24 P.3d 413 (2001) (appellate court may affirm entry of summary judgment on grounds other than those relied upon by trial court).

Moreover, as Coopers argues, like the fiduciary duty and negligent misrepresentation claims, the jury found no causal relationship between Coopers' representations or omissions and any of MEI's losses, in any event. The jury heard evidence of all of the same conduct that MEI considers a breach of the CPA but refused to connect that conduct with its *claimed* damages. *See Griffin v. W. RS, Inc.*, 143 Wn.2d 81, 88-89, 18 P.3d 558 (2001) (no prejudice in dismissing alternate theories when proximate cause deter-

---

[5] *See Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 167, 795 P.2d 1143 (1990) (plaintiffs were members of public randomly chosen and induced by deceptive appraisal document to invest in property); *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 49-50, 686 P.2d 465 (1984) (construction contractor's numerous misrepresentations and substitutions of unauthorized materials with opposing party and several other people showed continuing program of deceptive acts); *Eifler v. Shurgard Capital Mgmt. Corp.*, 71 Wn. App. 684, 696, 861 P.2d 1071 (1993) (evidence deception in yellow page advertisement); *Keyes v. Bollinger*, 31 Wn. App. 286, 292, 640 P.2d 1077 (1982) (contractor's business practice of providing estimates to purchasers was a deceptive practice when it was unable to substantially comply with estimates for reasons that should have been reasonably foreseeable to contractor).

mination is same even under heightened standard of care). And there is no showing here that Coopers overbilled MEI, billed for services not rendered, or charged hourly rates in excess of usual hourly rates for employees working on the MEI project. Here any determination by the jury that Coopers overcharged MEI inheres in the zero verdict on Coopers' counterclaim alleging MEI failed to pay Coopers' professional fees. The jury was authorized to award MEI additional damages on its own claims, but chose not to.

The judgment is affirmed. And we dismiss Coopers' cross-appeal without reaching the merits.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

BROWN, A.C.J., and KATO, J., concur.