2014 AUG 25 AM 10: 5U


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RALMA EHLERT, individually and as Personal Representative of the Estate of ROBERT S. EHLERT; and TAMARA JONES, as Personal Representative of the Estate of JAMES A. JONES, | NO. 70309-9-I |
| | DIVISION ONE |
| Appellants, | UNPUBLISHED OPINION |
| v. | FILED: August 25, 2014 |
| BRAND INSULATIONS, INC., | |
| Respondent, | |
| HASKELL CORPORATION, | |
| Defendant. | |

LEACH, J. — Ralma Ehlert and Tamara Jones (collectively Ehlert)[1] appeal a trial court judgment dismissing their asbestos claims against Brand Insulations Inc. Ehlert challenges the court's dismissal of his strict liability claims at the close of all evidence, its jury instructions, and its exclusion of Ehlert's proffered newspaper articles about asbestos. Brand cross appeals, challenging the trial court's denial of its motions for judgment as a matter of law at the close of Ehlert's case on Ehlert's strict liability and negligence claims and at the close of

---

[1] Ehlert filed this action individually and as personal representative of her husband's estate. Jones filed this action as personal representative of her husband's estate. Because both individuals represent their husbands' estates, we use masculine pronouns.

evidence on Ehlert's negligence claims. Because we reject Ehlert's claims, we do not consider Brand's cross appeal. We affirm.

FACTS

In 1970, Brand subcontracted with general contractor Ralph M. Parsons Inc. to install insulation at the ARCO Cherry Point Refinery. This subcontract contained hot insulation specifications listing brands and types of insulation materials that Parsons required Brand to use. The subcontract stated, "All piping shall be insulated with 'chloride free' calcium silicate insulation as manufactured by PABCO Division of Fibreboard Corporation, Emeryville, California and/or Johns-Manville Sales Corporation, Industrial Insulations Division."[2] This subcontract also required that Brand invoice Parsons for the cost of materials, labor hours, and scaffolding that it used to complete the work.

Between 1971 and 1972, Robert Ehlert worked as a welder and James Jones worked as a pipefitter at the ARCO Cherry Point Refinery. Both worked near the insulators during the entire course of the installation. When the insulators cut the insulation, they generated "lots of dust" that "would be flying all over the place." The dust was in the air, on workers' clothes, and "like snow" on the ground. The insulators took no precautions to minimize the dust generated

---

[2] At trial, the parties disputed if all of the insulation installed contained asbestos. Neither party raises this issue on appeal.

by their work and did not wear respirators or masks. They provided no indication to Ehlert or Jones that either should avoid breathing the dust.

Both Ehlert and Jones died after developing mesothelioma. In 2010, Ehlert's and Jones's widows filed this lawsuit, asserting product liability and negligence claims.

At the close of Ehlert's case at trial, Brand moved for judgment as a matter of law on both the product liability and negligence claims. It argued that Ehlert failed to prove his exposure to asbestos at the ARCO facility was a substantial factor in his development of mesothelioma. The court denied this motion.

At the close of evidence, Brand renewed its motion for judgment as a matter of law. The court dismissed the strict liability claim and submitted the case to the jury on Ehlert's negligence theories.

The court rejected Ehlert's request to instruct the jury on negligent failure to warn and instead gave a general negligence instruction. The jury found that Brand was not negligent. The trial court entered a judgment on the verdict and for Brand's attorney fees and costs.

Ehlert appeals, and Brand cross appeals.

ANALYSIS

Ehlert first claims that the trial court should not have dismissed his strict liability claim based upon Brand's alleged status as a seller or distributor of a product containing asbestos. CR 50(a)(1) states,

> If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law.

When reviewing a motion for judgment as a matter of law, we apply the same standard as the trial court.[3] In considering a motion for a judgment as a matter of law, the court must accept as true all competent evidence favorable to the plaintiffs and must also give them "the benefit of every favorable inference which may be reasonably drawn from such evidence."[4] The court must "'determine[ ] whether the proffered result is the only reasonable conclusion.'"[5] A court properly denies a motion for a judgment as a matter of law when substantial evidence for and against liability makes the issue of the defendant's

---

[3] Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001).

[4] Wilcoxen v. City of Seattle, 32 Wn.2d 734, 737, 203 P.2d 658 (1949) (citing Vercruysse v. Cascade Laundry Co., 193 Wash. 184, 187, 74 P.2d 920 (1938); Keller v. City of Seattle, 200 Wash. 573, 578, 94 P.2d 184 (1939)).

[5] Estate of Bordon v. Dep't of Corr., 122 Wn. App. 227, 241, 95 P.3d 764 (2004) (alteration in original) (quoting Hollmann v. Corcoran, 89 Wn. App. 323, 331, 949 P.2d 386 (1997)).

liability a question for the jury.[6]  Substantial evidence exists if "'it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'"[7]

The Washington product liability act, chapter 7.72 RCW, does not apply to Ehlert's claims because they arose before July 26, 1981.[8]  Therefore, § 402A of the Restatement (Second) of Torts (1965) applies.  This provision states,

> (1)  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>    (a) the seller is engaged in the business of selling such a product, and
>    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
>    (a) the seller has exercised all possible care in the preparation and sale of his product, and
>    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Comment c to § 402A states,

> On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which

---

[6] Jones v. Hogan, 56 Wn.2d 23, 25, 351 P.2d 153 (1960).
[7] Guijosa, 144 Wn.2d at 915 (quoting Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980)).
[8] RCW 4.22.920.

liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Comment f to § 402A states,

> Business of selling. The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.
>
> The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. . . . This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business.

Comment j to § 402A provides,

> Directions or warning. In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger.

Strict liability applies retroactively to all claims against product manufacturers and those in the business of selling or distributing a product.[9] A cause of action arises at the time of a plaintiff's exposure to asbestos, not when the plaintiff discovers an injury.[10]

In Simonetta v. Viad Corp.,[11] our Supreme Court explained, "We justify imposing liability on the defendant who, by manufacturing, selling, or marketing a product, is in the best position to know of the dangerous aspects of the product and to translate that knowledge into a cost of production against which liability insurance can be obtained."

Ehlert alleges that Brand was a seller of asbestos insulation because it "acquired the insulation itself, through its own business channels, and invoiced Parsons for the product." Ehlert further asserts, "Brand's position in the chain of distribution is akin to a wholesaler, purchasing asbestos insulation from an entity up the chain of distribution, then turning around and reselling it to a general contractor as part of its business of providing and installing insulation."

---

[9] Seattle-First Nat'l Bank v. Tabert, 86 Wn.2d 145, 148, 542 P.2d 774 (1975).

[10] Mavroudis v. Pittsburgh-Corning Corp., 86 Wn. App. 22, 34, 935 P.2d 684 (1997) (citing Koker v. Armstrong Cork, Inc., 60 Wn. App. 466, 471-72, 804 P.2d 659 (1991); Krivanek v. Fibreboard Corp., 72 Wn. App. 632, 865 P.2d 527 (1993); Viereck v. Fibreboard Corp., 81 Wn. App. 579, 915 P.2d 581 (1996)).

[11] 165 Wn.2d 341, 355, 197 P.3d 127 (2008).

The trial court disagreed, noting that "the only evidence I have in this case is one sale from Brand to Parsons of insulation." The court observed,

> [I]t seems to me that for Brand to be held under here that they have to, say, hire insulation installers to go out and do these things and then either ahead of time say we'll come out and we'll install it but you've got to buy this product from us and then we'll come and put it in. Or basically Brand does two things. They install insulation when an owner requests that they come and do it or they sell insulation products to other installers to put in. But when a general contractor says we want you to install insulation and you've got to buy this type of insulation and you've got to put this in our facility, I don't see that as a sale.

The court stated,

> [S]upplying isn't the standard. You have to be a manufacturer or a seller. Because if a supplier was the standard then anybody, once a product is put in the chain of customers who delivers, a supplier is nothing more than a deliverer of a product. So once a product is put into the chain of customers, and they transfer that item to somebody else, they're a supplier. And that would make the entire population susceptible to a suit under strict liability.

Michael McGinnis, who served as a project coordinator at Brand, testified, "Brand was not a distributor [of insulation products]. We bought materials for our own use. We didn't sell them as a distributor would." He testified that for the Cherry Point project, Parsons provided a form subcontract to all companies bidding on the project. The bidders included in their bids insulation products from a list of project specifications provided by Parsons. McGinnis testified that Brand chose the particular insulation products it used because "[t]he price was better."

-8-

He estimated that 70 percent of Brand's bid represented labor costs and 30 percent represented the cost of materials.

McGinnis described his job as follows:

> I laid out all of the drawings, identified the drawings from which we bid the project. I laid the work scope out for the supervision for the project. I purchased all the materials. I purchased the supplies. I did the progress reporting for Ralph M. Parsons. I managed the admin staff in the office . . . . And then also generated drafts of all the billings and got those approved by Parsons and then went to formal processing of those invoices and submitted them to Parsons for payment.

McGinnis noted, "Those would have been regarded as progress payments and the preponderance of the job was done on lump sum. At some point . . . Parsons reverted the contract from a hard money or lump sum project to a cost reimbursable or T[&]M project." McGinnis distinguished Brand from companies that "had both a contracting arm that did insulations and a sales arm that actually distributed insulation products." He further stated that Brand filed an insurance claim with the insulation supplier, PABCO, when it experienced problems with some of the insulation materials.

Although Brand invoiced Parsons for the materials it used to complete the subcontract, these invoices do not demonstrate that Brand was in the business of selling insulation products. Ehlert presented no evidence that Brand manufactured the insulation or that it marketed insulation for use and

-9-

consumption.[12] Brand chose the insulation it installed from a list that Parsons provided. The record shows that Brand merely received reimbursement for the cost of materials it used to complete a service contract; any alleged "sale" was incidental to the contract to provide installation services. At most, Brand was an occasional seller of insulation.[13] We conclude that substantial evidence supports the court's ruling that Brand was not a "seller" for the purposes of § 402A and affirm the judgment as a matter of law.

Ehlert also claims that if Brand was not a seller, strict liability still applies to Brand as a supplier in the chain of distribution. Ehlert relies upon Simonetta, which he notes "repeatedly included the term 'supply' in its discussion of the chain of distribution under § 402A." Although Simonetta stated that defendant Viad did not "manufacture or supply" the asbestos insulation at issue, the court did not hold that "suppliers" such as Brand are subject to strict liability under this provision.[14] Instead, the court held that Viad was not strictly liable for failure to warn about the dangers of asbestos because it did not market or manufacture asbestos insulation or have control over the type of insulation selected by the

---

[12] Restatement (Second) of Torts § 402A cmt. c.

[13] See Barham v. Turner Constr. Co., 803 S.W.2d 731, 738 (Tex. Ct. App. 1990) ("Any alleged 'sale' of the steel columns by Turner Construction was incidental to its contract to provide the services necessary to construct a building. At most, Turner Construction was an occasional seller of components of buildings; it was not engaged in the sale of steel columns as part of its business.").

[14] Simonetta, 165 Wn.2d at 358.

navy. Because we see no meaningful distinction between Viad and Brand, the court's actual holding defeats Ehlert's argument.

Next, Ehlert alleges, "The trial court erred by finding that the asbestos insulation was not an inherently dangerous product, and by inserting an irrelevant 'control' analysis into a failure to warn context." In response to the Ehlert's proposed jury instruction on product liability, the court stated,

> Here's what you're asking that I instruct the jury. A seller has a duty to supply products that are reasonably safe for use at the time they leave the seller's control.
> Now, in this case the only evidence, let's assume that Brand qualifies as a seller, the only evidence in this case is that the sale occurred after that, the product did not leave the seller's control, if Brand is the seller, until it was installed, and clad and banded. And an invoice was given to Parsons saying we get paid for this. So that product had not yet, if they are a seller, had never left their control when the alleged injury is suppose[d] to have occurred. It was in the possession of the seller the whole time. So it hadn't left the seller's control.

Because we conclude that the record does not contain evidence sufficient to show Brand was a seller subject to strict liability, we do not address this claim.

Ehlert also challenges the adequacy of the trial court's general negligence jury instruction. We review de novo the adequacy of challenged jury instructions.[15] "'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly

---

[15] State v. Mills, 154 Wn.2d 1, 7, 109 P.3d 415 (2005) (citing State v. DeRyke, 149 Wn.2d 906, 910, 73 P.3d 1000 (2003)).

inform the trier of fact of the applicable law.'"[16] The instruction is erroneous if any of these elements is missing, but an erroneous instruction is reversible error only if it prejudices a party.[17] Where jury instructions state the applicable law correctly, "the court's decision to give the instruction will not be disturbed absent an abuse of discretion."[18]

We also review a trial court's refusal to give a proposed jury instruction for an abuse of discretion.[19] A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds.[20]

The trial court's jury instruction stated,

Negligence is the failure to exercise ordinary care. It is the doing of some act that a reasonably careful person would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person would have done under the same or similar circumstances.

---

[16] State v. Davis, 174 Wn. App. 623, 635, 300 P.3d 465 (internal quotation marks omitted) (quoting State v. Aguirre, 168 Wn.2d 350, 363-64, 229 P.3d 669 (2010)), review denied, 178 Wn.2d 1012 (2013).

[17] Anfinson v. FedEx Ground Package Syst., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012) (citing Joyce v. Dep't of Corr., 155 Wn.2d 306, 323-25, 119 P.3d 825 (2005)).

[18] Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP, 110 Wn. App. 412, 430, 40 P.3d 1206 (2002) (citing Cramer v. Dep't of Highways, 73 Wn. App. 516, 520, 870 P.2d 999 (1994)).

[19] In re Det. of Pouncy, 168 Wn.2d 382, 390, 229 P.3d 678 (2010).

[20] State v. Emery, 161 Wn. App. 172, 190, 253 P.3d 413 (2011) (quoting State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006)), aff'd, 174 Wn.2d 741, 278 P.3d 653 (2012).

Ehlert claims that the court should have instructed the jury on both strict liability and negligent failure to warn. Ehlert's proposed instruction stated,

Each Plaintiff brings this action on the basis of two separate claims:

1. Products Liability

2. Negligence

You are to consider each claim separately with respect to each Plaintiff.

Each instruction will have a heading at the top indicating whether the instruction applies to the theory of product liability, or negligence or both.

With respect to Plaintiffs' product liability claims, each claim that Brand Insulations distributed, sold or supplied products that were not reasonably safe for use because:

1. These products contained asbestos, which as [sic] not reasonably safe to human life and health; and

2. These products did not contain adequate warning of the precise dangers involved with asbestos use.

With respect to each Plaintiff's negligence claim, each contend that Brand Insulations was negligent in one or more of the following respects:

1. Failure to warn foreseeable product users of the dangers of asbestos;

2. Failure to substitute safe products;

3. Failure to institute proper ventilation methods during product use;

4.      Failure to isolate asbestos dust during application and removal of its products;

5.      Failure to clean up during the application of its asbestos products.

The Plaintiffs claim that one or more of these acts was a proximate cause of the injuries and damage to Robert Ehlert and/or James Jones. Brand Insulations denies these claims and, further, denies the nature and extent of Plaintiffs' claimed injuries.

The foregoing is merely a summary of the claims of the parties. You are not to take the same as proof of the matter claimed unless admitted by the opposing party, and you are to consider only those matters which are admitted or established by the evidence. These claims have been outlined solely to aid you in understanding the issues.

Because we affirm the court's judgment as a matter of law on strict liability, we conclude that the court properly declined to give a strict product liability jury instruction.

The Restatement (Second) of Torts § 388 (1965) governs negligent failure to warn claims.[21] This provision states,

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

---

[21] Mele v. Turner, 106 Wn.2d 73, 78, 720 P.2d 787 (1986) (citing Fleming v. Stoddard Wendle Motor Co., 70 Wn.2d 465, 467-68, 423 P.2d 926 (1967)).

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

A supplier is "any person who for any purpose or in any manner gives possession of a chattel for another's use . . . without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used."[22]

The law of negligence requires a defendant to exercise ordinary care.[23] A supplier's duty of ordinary care includes a duty to warn of hazards involved in the use of a product which are or should be known to the supplier.[24] Therefore, in a negligent failure to warn cause of action, we focus on the supplier's conduct.[25]

When rejecting Ehlert's proposed instruction, the trial court explained, "The plaintiff, even if I give the generic one, plaintiff is going to be able to argue whatever theories of negligence they have." The court's given instruction is taken verbatim from WPI 10.01[26] and states the general law of negligence accurately.

---

[22] Restatement (Second) of Torts § 388 cmt. c.
[23] Simonetta, 165 Wn.2d at 348.
[24] Restatement (Second) of Torts § 388.
[25] Simonetta, 165 Wn.2d at 348.
[26] 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 10.01, at 124 (2012).

Ehlert argues, "The problem with the general negligence instruction is that it does not take into account the particularized standards of conduct Washington law imposes on those in the chain of distribution." But Ehlert does not show that the court's general negligence instruction prevented him from arguing his failure to warn theory of negligence. While other judges might have instructed the jury more specifically on the duty to warn, the trial court did not abuse its discretion when it declined to give Ehlert's proposed instruction and gave a general negligence instruction.

Ehlert also challenges the trial court's exclusion of three newspaper articles from the Seattle Times and two articles from the Chicago Tribune related to asbestos. We review a trial court's evidentiary rulings for an abuse of discretion.[27] A party challenging the court's ruling bears the burden of proving an abuse of discretion.[28]

Ehlert claims that the proffered articles "were relevant to proving Brand's knowledge of the risk of asbestos exposure in using insulation materials in the early 1970's [sic], a critical component of Ehlert's and Jones' failure to warn theory." The trial court ruled,

> I don't think that it's relevant. I really don't. . . . [Y]ou could pull out
> an article from any newspaper in the United States and say so and

---

[27] Hernandez v. Stender, ___ Wn. App. ___, 321 P.3d 1230, 1233 (2014) (citing Cox v. Spangler, 141 Wn.2d 431, 439, 5 P.3d 1265, 22 P.3d 791 (2000)).

[28] Hernandez, 321 P.3d at 1233 (citing Davis, 174 Wn. App. at 642).

-16-

so thought something, it was a problem, and therefore these people should have known. I don't know how you can say a Chicago company should be put on notice either—well, didn't know unless they admit they read the article or should have been able to find the article or had a duty to look for an article. I don't see how this is a connection. It's just too speculative where you're asking the jury to say that the defendant should have been searching newspaper articles about anything they were using on the work site to see if somebody thought there were problems with it.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[29] Only relevant evidence is admissible.[30]

Newspaper articles are not admissible as evidence to prove the truth of their contents.[31] A newspaper article is admissible for impeachment purposes if the witness "admitted having read or authorized the article."[32]

Ehlert could not offer these articles to establish the state of medical science about the dangers of asbestos exposure. He fails to demonstrate the relevance of the proffered newspaper articles to his negligent failure to warn claim. Ehlert does not show that Brand read or authorized the articles or that Brand had a duty to know about the dangers of the products it selected from the list that Parsons provided in the subcontract for installation services. We hold

---

[29] ER 401.
[30] ER 402.
[31] State ex rel. Pierce County v. King County, 29 Wn.2d 37, 45, 185 P.2d 134 (1947).
[32] Pierce County, 29 Wn.2d at 45.

-17-

that the trial court did not abuse its discretion when it excluded the newspaper articles.

On cross appeal, Brand claims that the trial court should have granted its motion for judgment as a matter of law at the close of Ehlert's case and also that the court should have granted its motion for judgment as a matter of law on Ehlert's negligence claim. Because we affirm the trial court, we do not address Brand's cross appeal.

## CONCLUSION

The record supports the trial court's dismissal of Ehlert's strict liability claims. The trial court did not abuse its discretion when it instructed the jury or when it excluded Ehlert's proffered newspaper articles about asbestos. Because we reject Ehlert's claims, we do not consider Brand's cross appeal. We affirm.

_Leach, J._

WE CONCUR:

_Spearman, C.J._                _Dwyer, J._